UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

KENNETH RICKENBACKER,

                          Plaintiff,

                                                          9:22-CV-0541
v.                                                         (MAD/ML)

B. KELLY,

                          Defendant.
_____

APPEARANCES:                                   OF COUNSEL:

KENNETH RICKENBACKER
   *Pro Se* Plaintiff
Franklin Correctional Facility
Post Office Box 10
Malone, New York 12953

LETITIA A. JAMES                               NICHOLAS W. DORANDO, ESQ.
Attorney General for the State of New York     Assistant Attorney General
   Counsel for Defendant
The Capitol
Albany, New York 12224


MIROSLAV LOVRIC, United States Magistrate Judge

## REPORT-RECOMMENDATION

        Currently before the Court, in this civil rights action filed by Kenneth Rickenbacker

("Plaintiff") against B. Kelly ("Defendant"), is Defendant's motion for summary judgement

pursuant to Fed. R. Civ. P. 56.  (Dkt. No. 32.)  For the reasons set forth below, I recommend that

Defendant's motion for summary judgement be granted.

## I.    RELEVANT BACKGROUND

### A.    Plaintiff's Claims

At this procedural posture, Plaintiff asserts a claim of excessive force in violation of the Eighth Amendment and 42 U.S.C. § 1983 against Defendant.  (Dkt. Nos. 1, 21.)  More specifically, Plaintiff alleges that on April 8, 2019, while confined at Clinton Correctional Facility ("Clinton"), Defendant responded to a group of inmates who "jumped" Plaintiff in the corridor at the bottom of the 12:1 staircase.  (*See generally* Dkt. Nos. 1, 21.)  Plaintiff alleges that Defendant "slammed" Plaintiff onto the floor with "extreme force" causing injury to Plaintiff's right wrist, shoulder, and back.  (Dkt. No. 1 at 4-5, 8; Dkt. No. 21 at 4.)

### B.    Defendant's Statement of Undisputed Material Facts

Unless otherwise noted, the following facts were asserted and supported by Defendant in his Statement of Material Facts and not denied by Plaintiff in a response.  (*Compare* Dkt. No. 32, Attach. 1 [Def.'s Statement of Material Facts], *with* docket sheet.)

1.     Plaintiff is an incarcerated individual who, at all relevant times, was in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS").

2.     Plaintiff signed his Complaint in this action on May 23, 2021, and it was filed with the Court on May 25, 2021.

3.     Plaintiff's sole remaining cause of action is a claim of excessive force in violation of the Eighth Amendment and 42 U.S.C. § 1983 against Defendant.

4.     DOCCS has an inmate grievance process established by 7 N.Y.C.R.R. § 701.1 *et seq.*  This process involves three steps: (1) complaint to the Inmate Grievance Review

Committee ("IGRC") at the individual facility; (2) appeal to the Superintendent of the facility; and (3) appeal to the Central Office Review Committee ("CORC").

5.      Plaintiff's allegations in this matter are proper subjects for a grievance under the DOCCS grievance procedures outlined in 7 N.Y.C.R.R. § 701.1 *et seq.*[1]

6.      The Clinton incarcerated grievance process was functioning during the period of August 3, 2017, until May 3, 2019, when Plaintiff was housed at Clinton.

7.      Clinton currently maintains all grievances from January 2019 to present, which would encompass an event that occurred on or about April 8, 2019.

8.      If Plaintiff had filed a grievance while incarcerated at Clinton, Clinton would have maintained a record of the file.

9.      Plaintiff did not file a grievance relative to these allegations.

10.     Plaintiff did not file an appeal relative to the claims listed in the Complaint.

**C.      Parties' Briefing on Defendant's Motion for Summary Judgment**

**1.      Defendant's Memorandum of Law**

Generally, in support of his motion for summary judgment, Defendant asserts that Plaintiff failed to exhaust his administrative remedies before commencing this action.  (*See generally* Dkt. No. 32, Attach. 2.)  More specifically, Defendant argues that Plaintiff did not file a grievance with the IGRC at Clinton regarding the allegations that form the basis of his claim against Defendant.  (Dkt. No. 32, Attach. 2 at 9.)  In addition, Defendant argues that Plaintiff did not file an appeal with CORC.  (*Id*.)  Thus, Defendant argues that Plaintiff did not exhaust his administrative remedies and this matter should be dismissed.  (*Id*.)

---

[1]      Although Defendant cites to the Declaration of Rachel Seguin at paragraph number 21 to support this contention (Dkt. No. 32, Attach. 1 at ¶ 5 [citing Dkt. No. 32, Attach. 3 at ¶ 21]), support for this contention is found in Ms. Seguin's declaration at paragraph 20.

### 2.    Plaintiff's Opposition

A response to Defendant's motion was due on or before October 22, 2022.  (Dkt. No. 33.)

On October 24, 2022, the Court *sua sponte* granted Plaintiff an extension of time to respond to

Defendant's motion for summary judgment until November 21, 2022.  (Dkt. No. 36.)  On

December 7, 2022, the Court again *sua sponte* granted Plaintiff an extension of time to respond

to Defendant's pending motion until January 6, 2023.  (Dkt. No. 37.)  To date, Plaintiff has not

filed a response to Defendant's pending motion.  (*See generally* docket sheet.)

## II.    RELEVANT LEGAL STANDARDS

### A.    Standard Governing A Motion For Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that

there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as

a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the [record] evidence

is such that a reasonable jury could return a verdict for the [non-movant]."  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).[2]  As for the materiality requirement, a dispute of fact is

"material" if it "might affect the outcome of the suit under the governing law . . . . Factual

disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all

ambiguities and draw all reasonable inferences against the movant.  *Anderson*, 477 U.S. at 255.

In addition, "[the movant] bears the initial responsibility of informing the district court of the

basis for its motion, and identifying those portions of the . . . [record] which it believes

---

[2]    As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to
create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation
omitted).  As the Supreme Court has explained, "[The non-movant] must do more than simply
show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus.*
*Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).  However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(a), (c), (e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-movant is proceeding *pro se*.[3]  (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.)[4]  As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[5]

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically."  *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).  Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant.  *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.);

---

[3]    *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J.) (citing cases).

[4]    *Cusamano*, 604 F. Supp. 2d at 426 & n.3 (citing cases).

[5]    *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

N.D.N.Y. L.R. 56.1.  What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1(b) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement[6]–even when the non-movant was proceeding *pro se*.[7]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3).[8]  Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden.  *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined

---

[6]    Among other things, Local Rule 56.1 (previously Local Rule 7.1(a)(3)) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  N.D.N.Y. L. R. 56.1.

[7]    *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases); *see also Prestopnik v. Whelan*, 253 F. Supp. 2d 369, 371 (N.D.N.Y. 2003) (Hurd, J.) (holding that the Court is not required to "perform an independent review of the record to find proof of a factual dispute.").

[8]    *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1(a)(3) (previously Local Rule 7.1(b)(3)); *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

that the moving party has met its burden to demonstrate entitlement to the relief requested therein

. . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30,

2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at

*2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

### B.    Standard Governing Exhaustion of Administrative Remedies

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with

respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or

other correctional facility until such administrative remedies as are available are exhausted."  42

U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1854-55 (2016) ("The [PLRA]

mandates that an inmate exhaust 'such administrative remedies as are available' before bringing

suit to challenge prison conditions.").  "[T]he PLRA's exhaustion requirement applies to all

inmate suits about prison life, whether they involve general circumstances or particular episodes,

and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516,

532 (2002).  "There is no question that exhaustion is mandatory under the PLRA and that

unexhausted claims cannot be brought in court."  *Jones v. Bock*, 549 U.S. 199, 211 (2007).

The PLRA requires "proper exhaustion," which means using all steps required by the

administrative review process applicable to the institution in which an inmate is confined and

doing so properly.  *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see*

*also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "'using all

steps that the [government] agency holds out, and doing so properly'" (quoting *Woodford*, 548

U.S. at 90)).  In New York State prisons, DOCCS has a well-established three-step incarcerated

grievance program ("IGP"), in which, (1) the inmate must file a grievance with the Inmate

Grievance Resolution Committee ("IGRC") within twenty-one days of the alleged occurrence,

(2) the inmate must then appeal an adverse decision by the IGRC to the superintendent of the facility within seven days after receipt of the IGRC's response, and (3) the inmate must then appeal an adverse decision by the superintendent to the CORC within seven days after receipt of the superintendent's response. 7 N.Y.C.R.R. § 701.5; *McGee v. McGready*, 16-CV-4187, 2018 WL 2045094, at *2 (S.D.N.Y. Apr. 30, 2018).

"[W]hen a grievance concerns staff harassment, DOCCS procedures provide for an expedited review that allows for the complaint to bypass IGRC review and proceed before the Superintendent in the first instance." *Jackson v. Jackson*, 16-CV-8516, 2021 WL 981849, at *4 (S.D.N.Y. Mar. 16, 2021); *see* 7 N.Y.C.R.R. § 701.8. Under the expedited procedure, the Superintendent has twenty-five days to respond to the grievance. 7 N.Y.C.R.R. § 701.8. If the Superintendent fails to respond within twenty-five days, the inmate may appeal directly to CORC. *Id.* § 701.8(g). If the Superintendent does respond, the inmate has seven days from receipt of the response to appeal to CORC. *Id.* § 701.8(h). The IGP Supervisor has discretion to grant exceptions to the time limits for filing or appealing grievances. *See id.* § 701.6(g). Whether or not the Superintendent timely responds, the procedure to appeal a determination of the Superintendent to CORC is to file "a notice of decision to appeal (form #2133) with the inmate grievance clerk." *Id.* § 701.8(g)-(h).[9] Inmates who have been transferred to a different facility can get their appeal to the appropriate grievance clerk by "mail[ing] the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed." *Id.* § 701.6(h)(2).

---

[9]     The procedure to appeal to CORC under the normal, non-expedited procedures is the same. 7 N.Y.C.R.R. § 701.5(d)(1)(i).

"CORC is required to provide, through IGP staff, written confirmation that an appeal has been received, and if the inmate does not receive such confirmation within forty-five days, he 'should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to CORC.'" *Ruiz v. Link*, 20-CV-0235, 2022 WL 3020254, at *4 (S.D.N.Y. July 29, 2022) (quoting 7 N.Y.C.R.R. § 701.5(d)(3)(i)).  The IGP requires CORC to respond to an appeal within thirty days of receipt.  7 N.Y.C.R.R. § 701.5(d)(3)(ii).  If CORC has received an appeal and fails to rule within those thirty days, the inmate is considered to have exhausted his administrative remedies and may file suit.  *Hayes v. Dahlke*, 976 F.3d 259, 270 (2d Cir. 2020).

While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion."  *Ross*, 136 S. Ct. at 1858.  More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted.  42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]") (quotation marks and citations omitted).  In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of."  *Ross*, 136 S. Ct. at 1859 (quotation marks and citations omitted).

The *Ross* Court identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA.  *Id.* at 1859-60.  First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates."  *Id.* at 1859.  "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use."  *Id.*  Finally, an administrative

remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860. In *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), the Second Circuit noted that "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" The illustrations of unavailability in *Ross* nonetheless guide the Court's inquiry. *Mena v. City of New York*, 13-CV-2430, 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

Because non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner has failed to satisfy the exhaustion requirements. *See Jones*, 549 U.S. at 216. The plaintiff must then establish the IGP grievance procedure was unavailable to him under *Ross*. *Id.*

## III.    ANALYSIS

After carefully considering the matter, for the reasons set forth in Defendant's memorandum of law (Dkt. No. 32, Attach. 2), I recommend that the Court grant Defendant's motion for summary judgment. The following is intended to supplement—not supplant—those reasons.

The alleged events at issue in this matter occurred on April 8, 2019. (*See generally* Dkt. No. 1.) The deadline for Plaintiff to file a grievance with Clinton's IGRC expired on April 29, 2019. 7 N.Y.C.R.R. § 701.5(a). Plaintiff was housed at Clinton from August 3, 2017, until May 3, 2019. (Dkt. No. 32, Attach. 3 at ¶ 22; Dkt. No. 32, Attach. 3 at 8.) Thus, Plaintiff was housed at Clinton for the entire duration of time that he was eligible to file a grievance regarding the alleged incident with Defendant on April 8, 2019. Plaintiff did not file a grievance regarding the alleged events at issue in this matter. (Dkt. No. 32, Attach. 4 at ¶ 16.)

Moreover, Plaintiff did not file a grievance appeal to CORC regarding the alleged events at issue in this matter. (Dkt. No. 32, Attach. 3 at ¶¶ 25, 26; Dkt. No. 32, Attach. 3 at 11.)

As a result, I recommend that Plaintiff's Complaint (Dkt. No. 1) be dismissed for failure to exhaust his administrative remedies before commencing this action.

**ACCORDINGLY**, it is respectfully

**RECOMMENDED** that Defendant's motion for summary judgement (Dkt. No. 32) be **<u>GRANTED</u>**; and it is further respectfully

**RECOMMENDED** that Plaintiff's Complaint (Dkt. No. 1) be **<u>DISMISSED WITH PREJUDICE</u>**; and it is further respectfully

**ORDERED** that the Clerk of the Court shall file a copy of this Report and Recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[10]

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report.[11] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

---

[10]    The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[11]    If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

*Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.


Dated: April 19, 2023
        Binghamton, New York


Miroslav Lovric
U.S. Magistrate Judge

2009 WL 3672105
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Walter RUSYNIAK; and Anthony Rusyniak, Plaintiffs,
v.
Ena Paola GENSINI; Gunilla De Montaigu;
and Concha Futura, S.A., Defendants.

No. 5:07–CV–0279 (GTS/GHL).
|
Oct. 30, 2009.

**Attorneys and Law Firms**

Costello, Cooney & Fearon, PLLC, Robert M. Smith, Esq.,
Kristen L. Pickard, Esq., of Counsel, Syracuse, NY, for
Plaintiffs.

Hiscock & Barclay, LLP, Robert A. Barrer, Esq., of Counsel,
Syracuse, NY, for Defendants Gunilla De Montaigu and
Concha Futura, S.A.

Greene, Hershdorfer & Sharpe, Victor J. Hershdorfer, Esq., of
Counsel, Syracuse, NY, for Defendant Ena Paola Gensini.

*MEMORANDUM DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

**\*1** Currently pending before the Court in the above-
captioned action is a motion by Defendants containing two
alternative requests for relief: (1) a request for reconsideration
of Part III.D.5 of the Court's Decision and Order of May
5, 2009, denying Defendants' request for dismissal of all of
Plaintiffs' claims due to the doctrine of *forum non conveniens;*
and (2) a request for dismissal of the First Cause of Action
of Plaintiffs' Third Amended Complaint (asserting a claim of
violation of Panama law) as barred by the three-year statute of
limitations set forth in the certified translation of Article 1652
of the Panamanian Code. (Dkt. No. 61.) For the reasons set
forth below, Defendants' motion is granted in part, and denied
in part.

**I. REQUEST FOR RECONSIDERATION**
To the extent that Defendants' motion requests
reconsideration of the Court's decision to denying their

request for dismissal of all of Plaintiffs' claims due to the
doctrine of *forum non conveniens,* that motion is untimely.

Defendants' motion was filed on June 8, 2009. (Dkt. No.
61.) The Order of which reconsideration was sought was
entered on May 5, 2009. (Dkt. No. 56.) *See* N.D.N.Y.
L.R. 7.1(g) (setting ten-day deadline for motions for
reconsideration). Defendants' attempt to characterize the
Order of which reconsideration is sought as being the Court's
Text Order of May 29, 2009, is unconvincing. That Text
Order merely indicates the extent to which Plaintiffs' signed
Third Amended Complaint fails to comport with the Court's
Decision and Order of May 5, 2009 (and was issued in
response to Plaintiffs' request for guidance). Even liberally
construed, Defendants' motion for reconsideration expressly
and repeatedly challenges the substance of the Court's Order
of May 5, 2009 (specifically, Part III.D.5. thereof), and only
that Order. (*See, e.g.,* Dkt. No. 61, Part 2, ¶ 4; Dkt. No. 61,
Part 4, Points II and III.)

In any event, even if the Court were to consider the
merits of Defendants' motion for reconsideration, the Court
would deny that motion as without cause: there has been
no intervening change of controlling law, no previously
unavailable evidence, and there exists no clear error of law or
manifest injustice with regard to the relevant portion of the
prior decision in question.

For these reasons, Defendants' request for reconsideration is
denied.

**II. REQUEST FOR DISMISSAL OF FIRST CAUSE OF
ACTION**
To the extent that Defendants' motion alternatively requests
the dismissal of the First Cause of Action of Plaintiffs'
Third Amended Complaint (asserting a claim of violation of
Panama law) as barred by the three-year statute of limitations
set forth in the certified translation of Article 1652 of the
Panamanian Code, that motion is granted.

Defendants are correct that Plaintiffs failed, in their response
papers, to oppose this request. (*See* Dkt. No. 63.) The closest
that Plaintiffs come to opposing this request is when, in a
supplemental letter request, they (correctly) point out that
Defendants have improperly broadened the target of their
Panamanian-statute-of-limitations argument from Plaintiffs'
First Cause of Action to all of Plaintiffs' causes of action.
(Dkt. No. 66; *see also* Dkt. No. 61, Part 4, at 7–8.) As a
result of Plaintiffs' failure to address Defendants' argument

regarding Plaintiffs' First Cause of Action, Defendants' burden on this motion is somewhat lightened with regard to that cause of action. [1]

**\*2** After carefully reviewing the parties' motion papers, and Plaintiffs' Third Amended Complaint, the Court finds that Defendants have met their lightened burden on their motion to dismiss Plaintiff's First Cause of Action. The Court reaches this conclusion based on substance of the certified translation provided by Defendants (i.e., the certified translation of Article 1652 of the Commercial Code of the Republic of Panama). (Dkt. No. 61, Part 3.) The Court reaches this conclusion also based on the reasons stated in Part III.D.7.a. of the Court's Order of May 5, 2009. (*See* Dkt. No. 56, at 44–47.) *See also* *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 231–33 (N.D.N.Y.2009) (Suddaby, J.).

For these reasons, Defendants' request to dismiss Plaintiff's First Cause of Action is granted.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion (Dkt. No. 61) is **GRANTED in part,** and **DENIED in part,** in accordance with the above Decision and Order; and it is further

**ORDERED** that Defendants' motion for reconsideration of the May 5, 2009 Decision and Order is **DENIED,** however, the First Cause of Action of Plaintiffs' Third Amended Complaint (Dkt. No. 58) is **DISMISSED** as barred by the three-year statute of limitations set forth in the certified translation of Article 1652 of the Panamanian Code; and it is further

**ORDERED** that counsel for all parties are directed to attend an in-person pretrial conference on **NOVEMBER 19, 2009 at 2:00 p.m.** in Judge Suddaby's chambers in Syracuse, New York, at which counsel are directed to appear with settlement authority.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3672105

## Footnotes

1    *See* *Cossey v. David,* 04–CV–1501, 2007 WL 3171819, at \*7 (N.D.N.Y. Oct. 29, 2007) (Lowe, M.J. *adopted by* Scullin, J.) (noting that, where plaintiffs do not respond to defendants' argument made in their summary judgment motion, plaintiffs are deemed to have consented to defendants' argument, and thus defendants must only satisfy "their modest burden of demonstrating entitlement to the relief requested through that argument"); *Saunders v. Ricks,* 03–CV–598, 2006 WL 3051792, at \*9 (N.D.N.Y. Oct. 18, 2006) (Lowe, M.J. *adopted by* Hurd, J.) ("By failing to respond to Defendants' first argument ... Plaintiff may be deemed to have consented to that argument under Local Rule of Practice 7.1(b)(3). Thus, Plaintiff's claim against those Defendants may be dismissed on that ground alone [provided that] ... Defendants have met their modest threshold burden to demonstrate entitlement to the relief requested in their motion for summary judgment."); *Beers v. GMC,* 97–CV–0482, 1999 U.S. Dist. LEXIS 12285, at \*27–31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3] ).

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 2473509
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Donna ESTE–GREEN, Plaintiff,
v.
Michael J. ASTRUE, Comm'r
of Social Security, Defendant.

No. 5:09–CV–0722 (GTS/GHL).
|
Aug. 7, 2009.

West KeySummary

**1**     **Social Security** ➤ Exhaustion of other remedies

Representative for a social security payee failed to exhaust her administrative remedies before filing her claim since there was no final decision after a hearing. The Social Security Administration (SSA) garnished the representative's wages after attempting to work out a repayment plan since the representative was overpaid on behalf of the payee. The representative contacted the SSA to complain about the garnishment and shortly thereafter, the representative filed the action with the Small Claims Court, without having a hearing or final order from the Commissioner of Social Security.

Social Security Act, § 205(g), 🔖 42 U.S.C.A. § 405(g).

27 Cases that cite this headnote

**Attorneys and Law Firms**

Donna Este–Green, Hempstead, NY, pro se.

Hon. Andrew T. Baxter, United States Attorney for the Northern District of New York, William H. Pease, Esq., Assistant U.S. Attorney, of Counsel, Syracuse, NY.

***DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

**\*1**   Currently before the Court, in this *pro se* action filed by Donna Este–Green ("Plaintiff") to recover funds allegedly owed to her by the Social Security Administration, is a motion by Michael J. Astrue, Commissioner of Social Security ("Defendant") to dismiss the action pursuant to 🔖 Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction due to Plaintiff's failure to exhaust her administrative remedies before filing suit. (Dkt. No. 3.) Plaintiff has not opposed the motion. For the reasons set forth below, Defendant's motion is granted, and Plaintiff's Complaint is dismissed.

**I. BACKGROUND**

**A. Procedural History**

On or around May 27, 2009, Plaintiff brought this action in Small Claims Court, City of Ithaca, County of Tompkins ("Small Claims Court"), naming the Social Security Administration ("SSA") as Defendant. (Dkt. No. 1, Part 3.) Liberally construed, Plaintiff's Complaint alleges that the SSA wrongfully garnished her wages in the amount of five hundred seventy-one dollars ($571.00). (*Id.*) On June 24, 2009, the United States Attorney's Office for the Northern District of New York removed this case from the Small Claims Court, pursuant to the exclusive original jurisdiction of the District Court under 🔖 42 U.S.C. §§ 405(g)- (h) and 🔖 1383(c)(3), "because Plaintiff's claim appeared to relate to the payment of Social Security benefits to her as representative payee for the account of Albertina King." (Dkt. No. 3.)

**B. Relevant Facts**

In 1999, Plaintiff had been acting as representative payee for Albertina King, who had been receiving Social Security benefits under Title II of the Act. (Dkt. No. 3.) In October 1999, the SSA issued an overpayment to Plaintiff on Albertina King's account. (*Id.*) In March 2001, the SSA and Plaintiff arranged a repayment plan pursuant to which Plaintiff agreed to repay the amount due the SSA in fifty-dollar installments beginning on April 15, 2001. (*Id.*) In October 2007, the SSA sent a letter to Plaintiff, in which the SSA stated the

following: (1) Plaintiff had been overpaid as representative payee; (2) Plaintiff had the right to question the decision about her overpayment and to ask that the SSA not recover the overpayment; (3) the SSA's past attempts to recover this overpayment had not been successful; (4) there are actions that the SSA can take to recover the money, including wage garnishment; (5) Plaintiff could prevent the wage garnishment by taking certain steps within sixty days of the letter, including repaying the debt, agreeing to a definite repayment plan and repaying the debt according to that plan, asking the SSA to review the finding that she owed the amount stated and that the SSA had the right to collect it, asking the SSA to waive collection of the overpayment, or asking the SSA to review its plan to collect up to fifteen percent of her disposable pay. (*Id.*) In addition, the letter informed Plaintiff of how she could repay the SSA. (*Id.*)

**\*2** Plaintiff returned this letter to the SSA, stating that the overpayment was not her fault. (*Id.*) Plaintiff indicated that she could not afford the amount owed, and that the money that she received was used for the payee's burial. (*Id.*) In March, 2008, Plaintiff spoke with a supervisor of the SSA by telephone and negotiated a repayment plan agreement for installments of twenty dollars ($20). (*Id.*) On April 29, 2008, the SSA sent Plaintiff a billing statement indicating her debt of five hundred seventy-one dollars ($571), and that a minimum payment of twenty dollars ($20) must reach the SSA by May 15, 2008. (*Id.*) On May 6, 2008, documentation issued in connection with the administrative garnishment of Plaintiff's wages was returned to the SSA from Plaintiff's employer, stating that Plaintiff was no longer employed there. (*Id.*)

On April 17, 2009, the SSA issued an order to Plaintiff's employer to garnish her wages. (*Id.*) Plaintiff's employer completed this order and returned it to the SSA. (*Id.*) On May 21, 2009, Plaintiff contacted the SSA to complain about the garnishment. (*Id.*) Shortly thereafter, Plaintiff filed this action with the Small Claims Court, and the Complaint was mailed to the SSA on May 27, 2009.

## II. APPLICABLE LEGAL STANDARDS

### A. Standard Governing Motions to Dismiss for Lack of Subject Matter Jurisdiction

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d

Cir.2000) (citing Fed.R.Civ.P. 12[b][1] ). With regard to a challenge to a determination by the Social Security Administration, "[a]ny individual may seek judicial review under 42 U.S.C. § 405(g) 'after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy.' *Diagnostic Cardioline Monitoring of New York, Inc. v. Leavitt,* 171 F. App'x. 374, 375 (2d Cir. March 17, 2006) (citing 42 U.S.C. § 405[g] ). "This final-decision-after-a-hearing requirement is critical to the federal court's grant of subject matter jurisdiction over these claims." *Leavitt,* 171 F. App'x. at 375 (citing *Weinberger v. Salfi,* 422 U.S. 749, 763–64 [1975] ). "In the absence of a final decision after a hearing, the federal court lacks subject matter jurisdiction to entertain the claim, and it must be dismissed." *Id.* (citation omitted).

### B. Standard Governing Unopposed Motions

"Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown." N.D.N.Y. L.R. 7.1(b)(3). Defendant's motion to dismiss was properly filed, and Plaintiff has failed to oppose them. Therefore, the Court must determine whether Defendant has met her burden to "demonstrate entitlement to the relief requested" under Local Rule 7.1(b)(3). [1] An inquiry into whether a movant has met its "burden to demonstrate entitlement" to dismissal under Local Rule 7.1(b)(3) is a more limited endeavor than a review of a contested motion. Specifically, under such an analysis, the movant's burden has appropriately been characterized as "modest." [2] This is because, as a practical matter, the burden requires only that the movant present an argument that is "facially meritorious." [3]

## III. ANALYSIS

**\*3** After carefully considering the file in this action, including Defendant's motion to dismiss and Plaintiff's Complaint, the Court finds that Defendant has met his lightened burden on his unopposed motion: he has demonstrated entitlement to the relief requested by presenting an argument that is facially meritorious. Even if the Court were to subject Defendant's motion to the more rigorous

scrutiny appropriate for contested motions, the Court would find that Defendant has met his burden: Plaintiff failed to exhaust her administrative remedies prior to commencing this action. [4] As a result, the Court lacks subject matter jurisdiction over Plaintiff's claims, and her Complaint is dismissed.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Complaint is ***DISMISSED.*** The clerk is directed to enter judgment and close the case.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2473509

## Footnotes

1    *See also* Fed.R.Civ.P. 7(b)(1) (requiring motions to, *inter alia,* "state with particularity the grounds therefor").

2    *See, e.g., Ciaprazi v. Goord,* 02–CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord, Saunders v. Ricks,* 03–CV–0598, 2006 WL 3051792, at *9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.); *Smith v. Woods,* 03–CV–0480, 2006 WL 1133247, at *17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.); *see also Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109–1110 (N.D.N.Y.2003) (Munson, J.) (reviewing merely whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *Wilmer v. Torian,* 96–CV–1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N .D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95–CV–989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

3    *See, e.g., Hernandez v. Nash,* 00–CV–1564, 2003 U.S. Dist. LEXIS 16258, at *7–8, 2003 WL 22143709(N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b] [3], "the court must review the motion to determine whether it is *facially meritorious"* ) [emphasis added; citations omitted]; *accord, Topliff v. Wal–Mart Stores East LP,* 04–CV–0297, 2007 U.S. Dist. LEXIS 20533, at *28 & n. 43, 2007 WL 911891 (N.D.N.Y. March 22, 2007) (Lowe, M.J.); *Hynes v. Kirkpatrick,* 05–CV–0380, 2007 U.S. Dist. LEXIS 24356, at *5–6 & n. 2 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); *Sledge v. Kooi,* 04–CV–1311, 2007 U.S. Dist. LEXIS 26583, at *28–29 & n. 40, 2007 WL 951447 (N.D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 22458 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Kele v. Pelkey,* 03–CV–0170, 2006 U.S. Dist. LEXIS 95065, at *5 & n. 2, 2006 WL 3940592 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 4336 (N.D.N.Y. Jan. 22, 2007) (Kahn, J.).

4    As noted by Defendant in his motion to dismiss, because Plaintiff failed to follow the required SSA regulations before bringing this action, there is no final decision for the Court to review under 42 U.S.C. § 405(g).

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 2045094
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Tony MCGEE, Plaintiff,

v.

Correction Officer MCGREADY, et al., Defendants.

16-CV-4187 (NSR)
|
Signed 04/30/2018

**Attorneys and Law Firms**

Tony McGee, Brooklyn, NY, pro se.

Colleen Kelly Faherty, State of New York Office of the Attorney General, New York, NY, for Defendants.

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

**\*1** Plaintiff, Tony McGee ("Plaintiff"), an incarcerated pro se inmate at Sing Sing Correctional Facility, brings this action pursuant 42 U.S.C. § 1983 against Inmate Grievance Supervisor Anthony Black ("Black"), former Corrections Counselor Mary Jackson ("Jackson"), Sergeant Murray or Murphy ("Sgt. Murray"), Sergeant Poole ("Sgt. Poole") and several other corrections officers. [1] Before this court is Defendant Black and Jackson's motion to dismiss the amended complaint as against them based on failure to plead a plausible claim, failure to exhaust administrative remedies, and qualified immunity. For the foregoing reasons, the motion is GRANTED.

**FACTUAL BACKGROUND**

The following facts are taken from Plaintiff's Amended Complaint and are deemed true for the purpose of this motion.

Plaintiff alleges that on or about July 22, 2013, while in the mess hall he was assaulted by a fellow "gang related Hispanic inmate" who made a derogatory or offensive statement. In response to the statement, Plaintiff punched the inmate in the face resulting in an altercation. During the fight, Plaintiff was repeatedly punched about the face causing several lacerations. Plaintiff alleges that a "Black Correction Officer" [2] was present in the mess hall, observed the incident, and failed to prevent it and/or failed to intervene.

On or about July 11, 2013, approximately eleven days prior to the altercation, Plaintiff spoke to Jackson and requested that he be placed in protective custody because he was threatened and being targeted by "gang-related Hispanic inmates." Jackson purportedly prepared a request for "voluntary protective custody," and informed Plaintiff he would be contacted sometime later. Later that day, Plaintiff was interviewed by Sgt. Murray concerning his request for protective custody. Plaintiff purportedly informed Sgt. Murray of the threats and being targeted. Plaintiff was once again informed he would be contacted sometime later. Plaintiff's request was not granted. Plaintiff suggests had he been placed in protective custody, as requested, he would not have been assaulted and injured. Additionally, Plaintiff asserts that Defendant Black failed to process multiple sick-call grievances by failing to forward them to Central Office Review Committee ("CORC"). Plaintiff asserts claims under the Eight and Fourteenth Amendments.

**STANDARD OF REVIEW**

**Rule 12(b)(6)**

On a 12(b)(6) motion, dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007) ). When there are well-pled factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679. The critical inquiry is whether the plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." Twombly, 550 U.S. at 555. A motion to dismiss will be denied where the allegations "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

**\*2** Where a pro se Plaintiff is concerned, Courts must construe the pleadings in a particularly liberal fashion. Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009). The Court must therefore interpret the pleading "to raise the strongest arguments that [it] suggest[s]." Harris v. City of N.Y., 607 F.3d 18, 24 (2d Cir. 2010) (internal quotations and citation

omitted). Nevertheless, a pro se plaintiff's pleading must contain factual allegations that sufficiently "raise a right to relief above the speculative level" (*Jackson v. N. Y.S. Dep't of Labor,* 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) ), and the Court's duty to construe the complaint liberally is not "the equivalent of a duty to re-write it." *Geldzahler v. New York Medical College,* 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009).

**Exhaustion**

The Prison Litigation Reform Act ("PLRA") precludes the filing of an action "with respect to prison conditions under [42 U.S.C. § 1983] ... by a prisoner confined in any jail, prison or other correction facility until such administrative remedies as are available are exhausted." *Williams v. Corr. Officer Priatno,* 829 F.3d 118, 122 (2d Cir. 2016) (internal quotations omitted). Whether an inmate has exhausted all administrative remedies turns on a review of "the state prison procedures [available] and the prisoner's grievance...." *See Espinal v. Goord,* 558 F.3d 119, 124 (2d Cir. 2009) citing *Jones v. Bock,* 549 U.S. 199, 218 (2007). Grievances at DOCCS are governed by the Inmate Grievance Program ("IGP"), which is based on a three-tiered system. *Id.* at 125. To adjudicate an inmate complaint: "(1) the prisoner files a grievance with the Inmate Grievance Resolution Committee ("IGRC"), (2) the prisoner may appeal an adverse decision by the IGRC to the superintendent of the facility, and (3) the prisoner then may appeal an adverse decision by the superintendent to the CORC. *Id.;* see also N.Y. Comp. Codes. R. & Regs., tit. 7, § 701.7 (1999).

Notably, exhaustion is an affirmative defense, not a pleading requirement; thus, inmate plaintiffs need not "specially plead or demonstrate exhaustion in their complaints." *Jones,* 549 U.S. at 216. Instead, Defendants must demonstrate lack of exhaustion. *Colon v. N. Y.S. Dep't of Corr. & Cmty. Supervision,* No. 15-CV-7432(NSR), 2017 WL 4157372, at *5 (S.D.N.Y. Sept. 15, 2017) citing *Key v. Toussaint,* 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009).

Dismissal on a 12(b)(6) motion for failure to exhaust is permissible where "it is clear on the face of the complaint that the plaintiff did not satisfy the PLRA exhaustion requirement." *Williams,* 829 F.3d at 122; see also *Parris v. N.Y.S. Dep't Corr. Sews.,* 947 F. Supp. 2d 354, 261 (S.D.N.Y. 2013) (citing *Johnson v. Westchester Cnty. Dep't*

*of Con: Med. Dep't,* No. 10-CV-6309, 2011 WL 2946168, at *2 (S.D.N.Y. July 19, 2011) for proposition that denial of motion was appropriate where complaint was ambiguous as to exhaustion). Further, on such a motion, where a court is confined to the four corners of the complaint, the documents attached thereto, and things of which it is entitled to take judicial notice (see, e.g., *Kleinman v. Elan Corp.,* 706 F.3d 145, 152 (2d Cir. 2013); *Gonzalez v. Hasty,* 651 F.3d 318, 321 (2d Cir. 2011) ), a court is only permitted to consider outside documents related to exhaustion and submitted by defendants under limited circumstances. See, *Smith v. Miller,* No. 15-CV-9561 (NSR), 2017 WL 4838322, at *5 (S.D.N.Y. Oct. 23, 2017) (noting courts can take judicial notice of administrative records in Section 1983 cases in limited circumstances). Those include instances where "the complaint a) was the standard pro se form complaint that had a check-box regarding exhaustion, b) contained allegations clearly stating that the inmate had exhausted his administrative remedies, or c) clearly pointed to the fact that the inmate had, in fact, not exhausted." *Cohn,* 2017 WL 4157372, at *5.

**Qualified Immunity**

**\*3** "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd,* 563 U.S. 731, 735 (2011) citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow,* 457 U.S. at 818-19. It is within the Court's discretion to determine the order in which the two prongs are analyzed. *Pearson v. Callahan,* 555 U.S. 223, 236 (2009).

DISCUSSION

Plaintiff asserts § 1983 claims under the Eighth Amendment against Defendants Black and Johnson. The essence of Plaintiff's claim is a failure to protect. Plaintiff's complaint suggest that Defendants' failure in processing or approving his request for voluntary confinement resulted in

his subsequent assault. Or, construing the allegations liberally as the Court is required to do, but for Defendants' failure in placing him in voluntary protective custody, Plaintiff would not have been attacked and injured by a fellow inmate.

Plaintiff's 1983 complaint is that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment, made applicable to the States by the Fourteenth. See *Estelle v. Gamble,* 429 U.S. 97, 102 (1976) citing *Robinson v. California,* 370 U.S. 660 (1962). "To prevail on an Eighth Amendment claim, an inmate must first show that his injury is objectively a 'sufficiently serious' one." *Brims v. Burdi,* No. 03-CV-3159 (WHP), 2014 WL 1403281, at *2 (S.D.N.Y. June 23, 2004)*Brims v. Burdi,* No. 03-CV-3159 (WHP), 2014 WL 1403281, at *2 (S.D.N.Y. June 23, 2004) quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998). Additionally, a plaintiff must "show that the defendant had knowledge of [the] prisoner's problem and was deliberately indifferent to [the] prisoner's plight." *Calhoun v. N. Y State Div. of Parole Officers,* 999 F.2d 647, 654 (2d Cir. 1993) citing *Sample v. Diecks,* 885 F.2d 1099, 1110 (3d Cir. 1989).

Deliberate indifference requires a showing that the conditions of incarceration posed a substantial risk of serious harm, and that prison officials possessed sufficient culpable intent. *Hayes v. New York City Dep't Of Corr.,* 84 F.3d 614, 620 (2d Cir. 1996) citing *Farmer v. Brennan,* 511 U.S. 825, 834 (1994).The deliberate indifference requires a two prongs analysis: substantial risk of serious harm, objective prong; and sufficient culpable intent, subjective prong. *Farmer,* 511 U.S. at 834; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir. 1996). Here, the objective prong is meet and not disputed.

Subjectively, the prison official acts with the requisite sufficient culpable state of mind when he (or she) "has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Hayes,* 84 F.3d at 620. Courts have denied deliberate indifference claims based upon surprise attacks. See *Fernandez v. N.Y.C. Dep't of Corr.,* No. 08-CV-4294 (KMW), 2010 WL 1222017, at *4 (S.D.N.Y. Mar. 29, 2010); *Zimmerman v. Macomber,* No. 95-CV-0882(DAB), 2001 WL 946383 (S.D.N.Y. Aug.

21, 2001). Plaintiff alleges he provided advance notice to Jackson and Black of threats and a possible attack. Plaintiff's allegation also suggest he identified the attacker(s), "gang related Hispanic inmates" at the facility. Plaintiff's allegations suggest that Black and Jackson failed to take reasonable measures to abate the impending attack. Thus, Plaintiff has pled a plausible Eighth Amendment claim.

**\*4** Plaintiff's Eighth Amendment claim, however, fails for failure to exhaust his administrative remedies. This case involves the use of the pro se form complaint which contains the equivalent of a check-box exhaustion section. The amended complaint is clear as to whether Plaintiff alleges he grieved his claims. Plaintiff explicitly states he filed grievances concerning, *inter alia,* the "5 sick call request," the "non-protection grievances" and the "foreseeable assault." (See Amended Compl., Sect. IV., E (1).) Because the exhaustion issue is an integral part of the prisoner's claims, the Court may refer to materials outside of the complaint on a 12(b)(6) motion in determining whether a plaintiff has exhausted. See *Smart v. Goode,* No. 04-CV-8850 (RWS), 2008 WL 591230, at *2 (S.D.N.Y. Mar. 3, 2008) (recognizing that the Court's previous opinion "[did] not faithfully capture the subtlety of exhaustion doctrine in the Second Circuit" and that the Court should have addressed non-exhaustion as an affirmative defense).

In support of their motion, Defendants submit a declaration from Karen Bellamy ("Bellamy"), the Director of the Inmate Grievance Program ("IGP"). Bellamy avers that she is the custodian of records maintained by the CORC, which is tasked with rendering administrative decisions on grievances filed by inmates. Based upon her review of the records, she found that Plaintiff made other complaints concerning meals, conditions of the facility, and "problems with security staff" on December 17, 2013. Plaintiff, however, did not file a grievance concerning the July 22nd incident nor his request for voluntary confinement. Though Plaintiff attempts to rebut Defendants' showing, mere conclusory statements in opposition is insufficient. Accordingly, Plaintiff's Eighth Amendment claims must be dismissed.

Plaintiff also asserts a claim based on Defendant Black's failure to process his grievances, including his "5 sick call grievances." It is well settled that in order to succeed on a § 1983 claim, Plaintiff must show that he has been deprived of a constitutional or other federal right. 42 U.S.C. § 1983. Inmate grievances procedures are undertaken voluntarily by

the states and are not constitutionally required. *Johnson v. New York City Dep't of Health,* No. 06-CV-13699 (BSJ) (FM), 2008 WL 5378124, at *3 (S.D.N.Y. Dec. 22, 2008) (internal citation omitted). Accordingly, a failure to process a prisoner's grievance(s) does not in itself give rise to a constitutional claim. *Swift v. Tweddell,* 582 F. Supp. 2d 437, 445-46 (W.D.N.Y. 2008) (internal citations omitted). This claim must therefore be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' motion is GRANTED in part and DENIED in part. Plaintiff's Eighth Amendment and claims premised on the failure to process his grievances are dismissed. The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 29. The parties are directed to confer, complete and submit to the Court a completed case management plan (blank form attached) within thirty (30) days of the date of this opinion.

SO ORDERED.

Attachment

---

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Rev. Jan. 2002

-----------------------------------------------------x

Plaintiff(s),

- against -

CIVIL CASE DISCOVERY PLAN
AND SCHEDULING ORDER

Defendant(s).          _____ CV _____ (NSR)

-----------------------------------------------------x

This Civil Case Discovery Plan and Scheduling Order is adopted, after consultation with counsel, pursuant to Fed. R. Civ. P. 16 and 26(f):

1. All parties [consent] [do not consent] to conducting all further proceedings before a Magistrate Judge, including motions and trial, pursuant to 28 U.S.C. § 636(c). The parties are free to withhold consent without adverse substantive consequences. (If all parties consent, the remaining paragraphs of this form need not be completed.)

2. This case [is] [is not] to be tried to a jury.

3. Joinder of additional parties must be accomplished by _____.

4. Amended pleadings may be filed until _____ _____.

5. Interrogatories shall be served no later than _____, and responses thereto shall be served within thirty (30) days thereafter. The provisions of Local Civil Rule 33.3 [shall] [shall not] apply to this case.

6. First request for production of documents, if any, shall be served no later than _____.

7. Non-expert depositions shall be completed by ____ _____ _____.

   a.   Unless counsel agree otherwise or the Court so orders, depositions shall not be held until all parties have responded to any first requests for production of documents.

   b.   Depositions shall proceed concurrently.

   c.   Whenever possible, unless counsel agree otherwise or the Court so orders, non-party depositions shall follow party depositions.

8. Any further interrogatories, including expert interrogatories, shall be served no later than _____.

9. Requests to Admit, if any, shall be served no later than _____.

10. Expert reports shall be served no later than _____.

11. Rebuttal expert reports shall be served no later than _____.

12. Expert depositions shall be completed by _____.

13. Additional provisions agreed upon by counsel are attached hereto and made a part hereof.

14. **ALL DISCOVERY SHALL BE COMPLETED BY** _____.

15. Any motions shall be filed in accordance with the Court's Individual Practices.

16. This Civil Case Discovery Plan and Scheduling Order may not be changed without leave of Court (or the assigned Magistrate Judge acting under a specific order of reference).

17. The Magistrate Judge assigned to this case is the Hon. _____.

18. If, after entry of this Order, the parties consent to trial before a Magistrate Judge, the Magistrate Judge will schedule a date certain for trial and will, if necessary, amend this Order consistent therewith.

19. The next case management conference is scheduled for _____, at _____. (The Court will set this date at the initial conference.)

SO ORDERED.

Dated: White Plains, New York
       _____

_____
Nelson S. Román, U.S. District Judge

**All Citations**

Not Reported in Fed. Supp., 2018 WL 2045094

McGee v. McGready, Not Reported in Fed. Supp. (2018)

Case 9:22-cv-00541-MAD-ML    Document 38    Filed 04/19/23    Page 23 of 51

**Footnotes**

1       The operative complaint is the Amended Complaint filed February 2, 2017. (ECF No. 22.)

2       In his complaint, Plaintiff appears to identify the "Black Correction Officer" as C.O. Javier Caban.

---

**End of Document**                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 981849
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Robert JACKSON, Plaintiff,

v.

C.O. Angela JACKSON, et al., Defendants.

16-CV-08516 (PMH)
|
Signed 03/16/2021

**Attorneys and Law Firms**

Robert Jackson, Beacon, NY, pro se.

Amanda Yoon, NYS Office of the Attorney General, New York, NY, Rebecca Lynn Johannesen, Colorado Department of Law, Denver, CO, for Defendants.

**MEMORANDUM OPINION AND ORDER**

PHILIP M. HALPERN, United States District Judge:

**\*1** Plaintiff Robert Jackson ("Plaintiff"), proceeding *pro se* and *in forma pauperis*, brings this action under 42 U.S.C. § 1983 against Correction Officers Angela Jackson, M. Walker, and J. James (collectively, "Defendants"). (Doc. 2, "Compl."). Specifically, Plaintiff alleges that in June 2015—while incarcerated at Sing Sing Correctional Facility in Ossining, New York ("Sing Sing")—Defendants violated his constitutional rights by: (1) using excessive force against him, in violation of the Eighth Amendment; and (2) filing a false internal complaint against him, in violation of the Fourteenth Amendment. (*See generally id.*).

On July 10, 2017, Defendants moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiff's due process claim along with all claims for monetary damages against them in their official capacities. (Doc. 16). By Opinion & Order dated April 20, 2018, Judge Román granted Defendants' motion and granted Plaintiff leave "to file an Amended Complaint ... on or before June 19, 2018." (Doc. 19 at 8). Despite securing an extension of the time within which to file his amended pleading, Plaintiff failed to do so. Consequently, the only claim remaining in this action is one for excessive force against Defendants in their individual capacities.

Defendants filed an Answer on August 30, 2018 (Doc. 22) and, with leave of Court, filed an Amended Answer on October 2, 2019. (Doc. 29, "Am. Ans."). Shortly thereafter, in an Order issued on October 22, 2019, Judge Román "waive[d] the Initial Pre-trial Conference and direct[ed] the parties to confer and complete a Case Management Plan and Scheduling Order...." (Doc. 30). Although Plaintiff filed a proposed discovery plan on November 19, 2019 (Doc. 32), Defendants filed a letter the following day to request both an extension of time within which to submit a proposed discovery schedule and a pre-motion conference to discuss an anticipated motion for summary judgment on the sole issue of administrative exhaustion (Doc. 31). There was no further activity on the docket in this case until it was reassigned to this Court in April 2020. [1]

On April 13, 2020, the Court granted Defendants' request, set a briefing schedule for the extant summary judgment motion, and directed Defendants to mail a copy of that Order to Plaintiff; Defendants filed an affidavit of service the same day. (Doc. 33; Doc. 34). Approximately one month later, on May 6, 2020, Defendants filed a letter requesting an extension of the briefing schedule. (Doc. 36). In that letter, Defendants noted also that upon "conferr[ing] with the New York State Division of Parole," they had learned that Plaintiff had been released from custody and was believed to be residing at an address in New York, New York. (*Id.*). In an endorsement dated May 7, 2020, the Court granted Defendants' request to extend the briefing schedule and directed Defendants to serve a copy of that Order on Plaintiff; Defendants filed an affidavit of service the next day indicating that the Order had been mailed to Plaintiff's address in New York City. (Doc. 37; Doc. 38).

**\*2** Defendants filed their motion for summary judgment on June 15, 2020. (Doc. 39; Doc. 40, "Def. Br."). On July 23, 2020, Defendants filed a letter noting that Plaintiff's time to oppose the pending motion had passed and requesting that the Court consider the motion unopposed. (Doc. 44). The Court endorsed the letter on July 24, 2020, extended Plaintiff's time to file an opposition to August 24, 2020 *sua sponte*, and advised that "[i]f plaintiff fails to file his opposition by August 24, 2020, the motion will be deemed fully submitted and unopposed." (Doc. 45). The Court also instructed Defendants to serve a copy of that Order on Plaintiffs (*id.*); Defendants filed an affidavit of service that reflected mailings to both

Fishkill and the address in New York City shortly thereafter. (Doc. 46). The Court has received no communications from Plaintiff since November 2019 and, as such, considers the motion fully submitted and unopposed.

For the reasons set forth below, Defendants' motion for summary judgment is GRANTED.

## BACKGROUND

The facts, as recited below, are taken from the Complaint, Defendants' Local Civil Rule 56.1 Statement (Doc. 42, "56.1 Stmt."), and the admissible evidence submitted by the parties. [2]

I. The Underlying Incident
Plaintiff's factual allegations, *in toto*, are as follows:

> After an arguement [sic] with C.O. Jackson in the messhall[,] I was taken to the bridge area where the defendants beat me into a seizure, then fabricated a misbehavior report to justify their actions.

(Compl. at 4). Plaintiff maintains that this incident occurred on June 4, 2015. (*Id.*).

II. Plaintiff's Grievance
Plaintiff filed the Grievance on June 17, 2015. (Quick Aff. ¶ 9; Quick Ex. B). Therein, Plaintiff complained that as he "was walking out [of] the messhall" on June 4, 2015, "C.O. Ms. Jackson and ... other[s] ... beat me down...." (Quick Ex. B). On August 14, 2015, following an investigation into Plaintiff's complaint, the Sing Sing Superintendent issued a written decision denying the Grievance. (Quick Aff. ¶ 11; Quick Ex. C). In full, the Superintendent's written decision reads as follows:

> Grievant claims staff harassment.
>
> The grievant was interviewed by a supervisor. The grievant had nothing further to add to his original complaint and provided no witnesses.

> Staff involved were interviewed and provided a written report denying the allegations of wrongdoing or harassing the grievant.
>
> Based on the investigation conducted, insufficient evidence could be found to substantiate the grievant [sic] allegations. Grievance is denied.

(Quick Ex. C). The Superintendent's decision advised that Plaintiff had seven days to appeal the determination to CORC, should he choose to do so (*id.*); however, there is no record that Plaintiff ever appealed to CORC (Quick Aff. ¶ 12; Seguin Aff. ¶¶ 6-7; Seguin Ex. B).

## STANDARD OF REVIEW

**\*3** Pursuant to Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and is genuinely in dispute 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Liverpool v. Davis*, 442 F. Supp. 3d 714, 722 (S.D.N.Y. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). " 'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." *Sood v. Rampersaud*, No. 12-CV-5486, 2013 WL 1681261, at \*1 (S.D.N.Y. Apr. 17, 2013) (quoting *Anderson*, 477 U.S. at 248). The Court's duty, when determining whether summary judgment is appropriate, is "not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Id.* (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)). Indeed, the Court's function is not to determine the truth or weigh the evidence; the task is material issue spotting, not material issue determining. Therefore, "where there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial...." *Bellotto v. Cty. of Orange*, 248 F. App'x 232, 234 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006)). Claims simply cannot proceed in the absence of sufficient proof as to an essential element.

"It is the movant's burden to show that no genuine factual dispute exists," 🚩 *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing 🚩 *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)), and a court must "resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Id.* (citing 🚩 *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003)). Once the movant has met its burden, the non-movant "must come forward with specific facts showing that there is a genuine issue for trial." 🚩 *Liverpool*, 442 F. Supp. 3d at 722 (quoting 🚩 *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). The non-movant cannot defeat a summary judgment motion by relying on "mere speculation or conjecture as to the true nature of the facts...." *Id.* (quoting 🚩 *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)). However, "[i]f there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper." *Sood*, 2013 WL 1681261, at *2 (citing 🚩 *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004)).

Should there be no genuine issue of material fact, the movant must also establish its "entitlement to judgment as a matter of law." *In re Davis New York Venture Fund Fee Litig.*, 805 F. App'x 79, 80 (2d Cir. 2020) (quoting 🚩 *FIH, LLC v. Found. Capital Partners LLC*, 920 F.3d 134, 140 (2d Cir. 2019)). Stated simply, the movant must establish that the law favors the judgment sought. 🚩 *Gonzalez v. Rutherford Corp.*, 881 F. Supp. 829, 834 (E.D.N.Y. 1995) (explaining "that summary judgment is appropriate only when ... law supports the moving party"); *Linares v. City of White Plains*, 773 F. Supp. 559, 560 (S.D.N.Y. 1991) (summary judgment is appropriate when "the law so favors the moving party that entry of judgment in favor of the movant ... is proper"). This standard applies equally to claims for relief and affirmative defenses. *Giordano v. Market Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2010) ("The same standard applies whether summary judgment is granted on the merits or on an affirmative defense...."). [3]

**\*4** The Court is, of course, mindful that "[*p*]*ro se* litigants are afforded a special solicitude," which includes reading their filings "to raise the strongest arguments they suggest." 🚩 *Mortimer v. City of New York*, No. 15-CV-7186, 2018 WL 1605982, at *9 (S.D.N.Y. Mar. 29, 2018) (internal quotation

marks omitted). "It is through this lens of leniency towards *pro se* litigants that this Court must consider a defendant's motion for summary judgment against a *pro se* plaintiff," 🚩 *Adams v. George*, No. 18-CV-2630, 2020 WL 5504472, at *5 (S.D.N.Y. Sept. 8, 2020), but the mere fact that a litigant is *pro se* "does not relieve the plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment," 🚩 *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (internal quotation marks omitted). Where, as here, a *pro se* litigant fails to oppose a motion for summary judgment, the motion may be granted as unopposed only "if: (1) the plaintiff has received adequate notice that failure to file any opposition may result in dismissal of the case; and (2) the Court is satisfied that the facts as to which there is no genuine dispute show that the moving party is entitled to judgment as a matter of law." *McNair v. Ponte*, No. 17-CV-2976, 2020 WL 3402815, at *3 (S.D.N.Y. June 18, 2020) (quoting *Warren v. Chem. Bank*, No. 96-CV-6075, 1999 WL 1256249, at *2 (S.D.N.Y. Dec. 22, 1999)). [4]

## ANALYSIS

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under 🔵 section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as available are exhausted." 🚩 42 U.S.C. § 1997e(a). This provision "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes," *Hernández v. Coffey*, 582 F.3d 303, 305 (2d Cir. 2009) (quoting 🚩 *Porter v. Nussle*, 534 U.S. 516, 532 (2002)), and it is " 'mandatory': [a]n inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies." 🚩 *Ross v. Blake*, 136 S.Ct. 1850, 1856 (2016) (citation omitted). "Moreover, the PLRA 'requires proper exhaustion, which means using all steps that the prison grievance system holds out.' " *Ayala-Rosario v. Westchester Cty.*, No. 19-CV-3052, 2020 WL 3618190, at *4 (S.D.N.Y. July 2, 2020) (quoting 🚩 *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016)). This "means that 'prisoners must complete the administrative review process in accordance with the applicable procedural rules—rules that are defined not by the PLRA, but by the prison grievance process itself.' " *Gottesfeld v. Anderson*,

No. 18-CV-10836, 2020 WL 1082590, at *6 (S.D.N.Y. Mar. 6, 2020) (quoting *Johnson v. Killian*, 680 F.3d 234, 238 (2d Cir. 2012)). Accordingly, the Court looks to the process available to Plaintiff. *See Dinkins v. New York*, No. 19-CV-08447, 2020 WL 5659554, at *6 (S.D.N.Y. Sept. 23, 2020).

There are three levels of review for inmate grievances at Sing Sing. *See generally Amador v. Andrews*, 655 F.3d 89, 96-97 (2d Cir. 2011) (outlining the three-step process). First, a grievance is reviewed by the Inmate Grievance Resolution Committee ("IGRC"), a facility-level body consisting of inmates and facility staff members. (Quick Ex. A §§ 701.4, 701.5(a)-(b); Senguin Ex. A §§ 701.4, 701.5(a)-(b)). Second, should the inmate be dissatisfied with the IGRC's determination, he may appeal that decision to the Superintendent. (Quick Ex. A § 701.5(c); Senguin Ex. A § 701.5(c)). Finally, if the Superintendent's conclusions are unfavorable, the inmate may appeal that decision to CORC. (Quick Ex. A § 701.5(d); Senguin Ex. A § 701.5(d)). However, when a grievance concerns staff harassment, DOCCS procedures provide for an expedited review that allows for the complaint to bypass IGRC review and proceed before the Superintendent in the first instance. (*See* Quick Ex. A § 701.8; Senguin Ex. A § 701.8). Both the Superintendent and CORC are required to "date stamp all" grievances or appeals forwarded to them for review (Quick Ex. A §§ 701.5(c)(3), 701.5(d)(3)(i); Senguin Ex. A §§ 701.5(c)(3), 701.5(d)(3)(i)) and require entities to maintain files "for the current calendar year plus the previous four calendar years" (Quick Ex. A § 701.6(k)(3); Senguin Ex. A § 701.6(k)(3)).

 **\*5**  Quick represents, as custodian of records maintained by the IGP at Sing Sing, that grievances "are collected from the IGRC mailbox and processed" daily, in accordance with DOCCS procedures. (Quick Aff. ¶ 5). Quick's records reveal that Plaintiff filed the Grievance on June 17, 2015, that the Grievance was forwarded directly to the Superintendent as one concerning staff harassment, and that the Superintendent performed an investigation and issued a written decision denying the Grievance on August 14, 2015. (*Id.* ¶¶ 9-11; Quick Ex. B). However, both Quick and Seguin represent affirmatively that they have no record of Plaintiff taking the final step of appealing the Superintendent's decision to CORC. (Quick Aff. ¶12; Seguin Aff. ¶¶ 6-7).

Even while granting Plaintiff—who filed nothing in opposition to this motion, and, in fact, has filed nothing in this case at all since November 2019 (*see* Doc. 32)—every conceivable benefit of the doubt to which a *pro se* litigant is entitled, there is no genuine issue of material fact on the instant motion. Consequently, summary judgment is proper here because: (1) Defendants established that Plaintiff failed to exhaust his administrative remedies and, as such, also their entitlement to summary judgment on the affirmative defense of Plaintiff's failure to exhaust his administrative remedies as required by the PLRA; and (2) Plaintiff was warned that failure to file an opposition would result in the Court concluding that the motion was unopposed.[5]

## CONCLUSION

Based upon the foregoing, the motion for summary judgment is GRANTED.

**SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 981849

## Footnotes

1    There are two docket entries reflecting reassignment of this matter from Judge Román to this Court on different dates. (*See* Apr. 3, 2020 Entry; Apr. 13, 2020 Entry).

2    In support of the instant motion, defense counsel filed a Declaration annexing two affidavits (with exhibits) for the Court's consideration. (Doc. 41). The first affidavit is from Quandera T. Quick ("Quick"), the Inmate Grievance Program ("IGP") Supervisor at Sing Sing. (Doc. 41-1, "Quick Aff." ¶ 1). This affidavit attaches as exhibits copies of: (1) New York State Department of Corrections and Community Supervision Directive

("DOCCS") No. 4040 (*id.* 5-21, "Quick Ex. A"); (2) Plaintiff's June 4, 2015 Grievance ("Grievance") (*id.* at 22-23, "Quick Ex. B"); and (3) the written decision issued by Michael Capra, Sing Sing's Superintendent, on August 14, 2015 (*id.* at 24-25, "Quick Ex. C"). The second affidavit is from Rachael Seguin ("Seguin"), the Assistant Director of the IGP for DOCCS and custodian of records for the Central Office Review Committee ("CORC"). (Doc. 41-2, "Seguin Aff."). This affidavit attaches as exhibits copies of: (1) DOCCS Directive No. 4040 (*id.* at 4-20, "Seguin Ex. A"); and (2) the results of a search for appeals filed with the CORC (*id.* at 21-23, "Seguin Ex. B").

3    "[T]he failure to exhaust administrative remedies in compliance with the [Prison Litigation Reform Act] is an affirmative defense" and it "may be waived" by a defendant who fails to raise it. *Banks v. Cty. of Westchester*, 168 F. Supp. 3d 682, 693 n.3 (S.D.N.Y. 2016) (internal quotation marks omitted). Here, Defendants' Fourth Affirmative Defense was failure to comply with 42 U.S.C. § 1997e. (Am. Ans. ¶ 14).

4    Given the Court's conclusion that there is no genuine issue of material fact as to exhaustion, it does not need to reach Defendants' request for an evidentiary hearing should the Court find otherwise.

5    Even if the Court did not grant Defendants' motion for summary judgment, it would dismiss the action with prejudice under Federal Rule of Civil Procedure 41(b) as a result of Plaintiff's failure to prosecute this action. Indeed, Plaintiff has not filed anything in this case since he filed a proposed discovery schedule more than a year ago.

---

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 3020254
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Michael RUIZ, Plaintiff,

v.

P. LINK, J. Reyes, Patrick Squire, Michael Blot,
Deborah Macdonald, and John Does #1-3, Defendants.

No. 20-CV-235 (CS)
|
Signed July 29, 2022

**Attorneys and Law Firms**

Michael Ruiz, Comstock, New York, Pro Se Plaintiff.

Kathryn Martin, Assistant Attorney General, Office of the
Attorney General of the State of New York, White Plains,
New York, Counsel for Defendants.


### OPINION & ORDER

Seibel, District Judge

**\*1** Before the Court is Defendants' motion for summary
judgment. (ECF No. 66.) For the reasons set forth below,
Defendants' motion is GRANTED.

### I. BACKGROUND

The following facts are based on Defendants' Local Civil
Rule 56.1 Statement, (ECF No. 68 ("D's 56.1 Stmt.")), and
supporting materials, and are undisputed unless otherwise
noted. [1]


#### A. Facts

Plaintiff Michael Ruiz is incarcerated in the custody of the
New York State Department of Corrections and Community
Supervision ("DOCCS"). (D's 56.1 Stmt. ¶ 1.) Plaintiff's
claims arose while he was held at Green Haven Correctional
Facility. (Id. ¶ 2.) Plaintiff brings this lawsuit in connection
with an altercation in the prison yard on April 6, 2019 and
the medical treatment he received thereafter. (Id. ¶¶ 3-4.)
He alleges excessive force claims against Defendants Link,
Reyes, Squire and Blot, and a claim of deliberate indifference
to medical needs against Defendant MacDonald. [2]

**\*2** The altercation and medical treatment at issue occurred
on April 6, 2019. (Ds' 56.1 Stmt. ¶¶ 3-4.) That same day,
Plaintiff was transferred from Green Haven to Sing Sing
Correctional Facility. (Id. ¶ 22.) While at Sing Sing, Plaintiff
filed a grievance, dated April 9, 2019, [3] alleging that on
April 6, 2019, correction officers used excessive force against
him, and medical staff failed to properly treat him. (D's 56.1
Stmt. ¶ 24; see ECF No. 71-6.) The grievance was denied
by the Sing Sing Superintendent on July 26, 2019. (D's 56.1
Stmt. ¶ 25; ECF No. 71-7.) Plaintiff testified at his deposition
that he did not receive a copy of the Superintendent's denial
until October 9, 2019, when he received a memo from Sing
Sing's Inmate Grievance Program ("IGP") Supervisor, dated
August 30, 2019. (P's Depo. at 79:22-80:13; see ECF No.
65-6.) The letter informed Plaintiff that his grievance had
been answered on July 26, 2019 and forwarded to Plaintiff at
that time; the Supervisor included with the memo a copy of
the Superintendent's July 26 denial. (Id.) The bottom portion
of the Superintendent's denial letter is a form the inmate
can fill out if he wishes to appeal; it states, "[R]eturn this
copy to your Inmate Grievance Clerk." (ECF No. 71-7.) [4]
By the time Plaintiff received the letter and the copy of
the Superintendent's denial on October 9, Plaintiff had been
transferred out of Sing Sing and was being held in the Special
Housing Unit ("SHU") at Elmira Correctional Facility. (Ds'
56.1 Stmt. ¶ 26; P's Depo. at 78:8-19, 78:25-79:21.) [5]

DOCCS records reflect that the Central Office Review
Committee ("CORC") never received any appeal of the
Superintendent's denial of Plaintiff's grievance. (D's 56.1
Stmt. ¶ 28.) Further, DOCCS records reflect that CORC did
not receive any correspondence from Plaintiff at all during
2019 or 2020. (Id. ¶ 29; see ECF No. 70 ("Seguin Decl.")
¶ 13.) Plaintiff asserted in his deposition that he filled out
the appeal form on October 10, 2019 and "forwarded it to
CORC ... [b]y mail." (P's Depo. at 80:24-81:4; see id. at
82:20-83:7.) Plaintiff did not specify the address to which he
mailed the appeal, but stated that he requested and received
the address from the law library. (Id. at 82:3-19.) Plaintiff did
not receive an acknowledgement of receipt or answer from
CORC. (Id. at 81:5-7.) After several months, he filed this
lawsuit. (Id. at 81:8-13.)


#### B. Procedural History

Plaintiff filed his original complaint on January 8, 2020,
bringing claims under 📁 42 U.S.C. § 1983 against eight

Green Haven employees in their individual capacities for violations of the Eighth Amendment. (ECF No. 2.) The case was reassigned to me on February 14, 2020. At a pre-motion conference on August 28, 2020 in anticipation of a potential motion to dismiss, I granted Plaintiff leave to amend his Complaint. (*See* Minute Entry dated Aug. 28, 2020.) The Amended Complaint was filed on September 18, 2020. (ECF No. 30.) Defendants answered on April 8, 2021. (ECF No. 44.)

On May 11, 2021, I held a status conference and set a discovery schedule, (ECF No. 51), which was extended twice, (ECF Nos. 57, 60). At the close of discovery, Defendants filed a pre-motion letter in anticipation of their motion for summary judgment. (ECF No. 64.) [6] I held a pre-motion conference on November 16, 2021 and set a briefing schedule for Defendants' motion. (*See* Minute Entry dated Nov. 16, 2021.) On December 29, 2021, Defendants filed their motion papers. (ECF Nos. 66-71.) Plaintiff's opposition was initially due on January 27, 2022. Approximately one to two weeks before the due date Plaintiff left two phone messages with my chambers, requesting an extension of the briefing schedule and permission to file a motion to obtain counsel. (*See* ECF No. 74.) On January 19, 2022, I entered an Order extending Plaintiff's time to respond to the motion to February 28, 2022, and advising him of his right to file a motion asking the Court to seek volunteer counsel. (*Id.*) On March 18, 2022, I received a letter from Plaintiff (dated March 14, 2022), indicating that his opposition was ready, and he just wanted permission to file it late; I granted an extension to April 6, 2022, and noted there would be no further extensions. (ECF No. 76.) On April 28, 2022, after no opposition was received, I deemed the motion fully submitted. (ECF No. 78.)

## II. LEGAL STANDARD

**\*3** Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law .... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to

be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (cleaned up).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ... admissions, interrogatory answers, or other materials ...." Fed. R. Civ. P. 56(c)(1). Where a declaration is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the ... declarant is competent to testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). In the event that "a party fails ... to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

*Pro se* litigants must be afforded "special solicitude," *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), "particularly where motions for summary judgment are concerned," *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014). Where, as here, the non-moving party fails to respond to the movant's summary judgment motion, "the district court may not grant the motion without first examining the moving party's submission to determine if it

has met its burden of demonstrating that no material issue of fact remains for trial." 🚩*Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (cleaned up). "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented." *Id.* (cleaned up) (emphasis omitted).

### III. DISCUSSION

#### A. Exhaustion Under the PLRA

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under 🚩section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 🚩42 U.S.C. § 1997e(a). Exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes." 🚩*Porter v. Nussle*, 534 U.S. 516, 532 (2002). The PLRA mandates that a plaintiff use "all steps that the agency holds out, and do[ ] so properly" – that is, in accordance with the applicable agency rules. 🚩*Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (cleaned up). Exhaustion of available administrative remedies "must be complete prior to commencement of suit" and "[t]he fact that a grievance is filed, or the process is completed, subsequent to commencement of suit will not salvage an otherwise premature filing." 🚩*Chalif v. Spitzer*, No. 05-CV-1355, 2008 WL 1848650, at *13 (N.D.N.Y. Apr. 23, 2008) (cleaned up).

**\*4** For inmates in New York State prison, administrative exhaustion requires compliance with DOCCS' three-tiered IGP, in which (1) the inmate must file a grievance with the Inmate Grievance Resolution Committee ("IGRC") within twenty-one days of the alleged occurrence, (2) the inmate must then appeal an adverse decision by the IGRC to the superintendent of the facility within seven days after receipt of the IGRC's response, and (3) the inmate must then appeal an adverse decision by the superintendent to the CORC within seven days after receipt of the superintendent's response. *See* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5 (2022); *McGee v. McGready*, No. 16-CV-4187, 2018 WL 2045094, at *2 (S.D.N.Y. Apr. 30, 2018).

"[W]hen a grievance concerns staff harassment, DOCCS procedures provide for an expedited review that allows for the complaint to bypass IGRC review and proceed before the Superintendent in the first instance." *Jackson v. Jackson*, No. 16-CV-8516, 2021 WL 981849, at *4 (S.D.N.Y. Mar. 16, 2021); *see* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.8. Under the expedited procedure, the Superintendent has twenty-five days to respond to the grievance. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.8(f). If the Superintendent fails to respond within twenty-five days, the inmate may appeal directly to CORC. *Id.* § 701.8(g). If the Superintendent does respond, the inmate has seven days from receipt of the response to appeal to CORC. *Id.* § 701.8(h). The IGP Supervisor has discretion to grant exceptions to the time limits for filing or appealing grievances. *See id.* § 701.6(g). Whether or not the Superintendent timely responds, the procedure to appeal a determination of the Superintendent to CORC is to file "a notice of decision to appeal (form #2133) with the inmate grievance clerk." *Id.* § 701.8(g)-(h). [7] Inmates who have been transferred to a different facility can get their appeal to the appropriate grievance clerk by "mail[ing] the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed." *Id.* § 701.6(h)(2).

CORC is required to provide, through IGP staff, written confirmation that an appeal has been received, and if the inmate does not receive such confirmation within forty-five days, he "should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to CORC." *Id.* § 701.5(d)(3)(i). The IGP requires CORC to respond to an appeal within thirty days of receipt. *Id.* § 701.5(d)(3)(ii). If CORC has received an appeal and fails to within those thirty days, the inmate is considered to have exhausted his administrative remedies and may file suit. 🚩*Hayes v. Dahlke*, 976 F.3d 259, 270 (2d Cir. 2020).

#### B. Plaintiff's Failure to Exhaust

Defendants have met their burden to demonstrate that Plaintiff failed to follow IGP procedures with regard to his CORC appeal and that CORC never received Plaintiff's appeal. Accordingly, Plaintiff failed to "properly" exhaust administrative remedies prior to filing suit. *See* 🚩*Amador*, 655 F.3d at 96.

Plaintiff testified that once he received the Superintendent's adverse decision on October 9, 2021, he filled out the appeal statement and "forwarded it to CORC ... [b]y mail." (P's Depo.

at 80:24-81:4.) He never received confirmation that his appeal was received or any response from CORC, and after a few months he filed this lawsuit. (*Id.* at 81:8-13.)

The IGP required Plaintiff to forward the appeal to the Inmate Grievance Clerk. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.8(g)-(h). The form at the bottom of the Superintendent's letter also notified Plaintiff that the appeal to CORC had to be transmitted via the Inmate Grievance Clerk. (*See* ECF No. 71-7.) The IGP specifically provides that Plaintiff, having been transferred to a different facility from that in which he originally filed his grievance, should get his appeal to the proper Inmate Grievance Clerk by "mail[ing] the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed." *Id.* § 701.6(h)(2). Nothing in the record indicates that Plaintiff followed this procedure; rather, it appears he tried to mail his appeal directly to CORC, and CORC never received the document. (*See* Seguin Decl. ¶¶ 12-13 (CORC never received appeal of Plaintiff's grievance, nor did it receive any other correspondence from Plaintiff during 2019 or 2020); ECF No. 71-8 (CORC records showing no receipt of appeal)).

**\*5** Accordingly, Plaintiff failed to properly follow the grievance procedure and has failed to exhaust his administrative remedies. *See Valverde v. Folks*, No. 19-CV-8080, 2022 WL 836310, at \*6 (S.D.N.Y. Mar. 21, 2022) ("Plaintiff did not properly comply with [the] prison grievance procedural rules. Plaintiff ... mailed his appeal statement directly to CORC. However, to appeal a decision denying a grievance, an inmate must submit the appeal, not directly to CORC, but to the grievance supervisor of the facility where the grievance was originally filed for forwarding to that facility's grievance clerk."); *Wilkinson v. Banks*, No. 2-CV-361, 2007 WL 2693636, at \*6 (W.D.N.Y. Sep. 10, 2007) ("[N]o dispute exists that [the *pro se* plaintiff] did not follow correct procedure in attempting to appeal that grievance to CORC. He did not file his appeal with the Inmate Grievance Clerk as required by the regulations, but rather mailed it directly to CORC.") (cleaned up).

## C. Availability of Administrative Remedies

Although the Supreme Court has deemed exhaustion mandatory, there are circumstances under which administrative remedies may be deemed "unavailable" to an inmate, such that an inmate is not required to exhaust. *Ross v. Blake*, 578 U.S. 632, 642 (2016). The Supreme Court identified three circumstances where administrative

remedies may be unavailable. *See id.* at 643-44. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 643. Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Third, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644. "If the defendant has met its burden of establishing the existence and applicability of the grievance policy, the *plaintiff* bears the burden of establishing *de facto* unavailability." *Saeli v. Chautauqua County*, 36 F.4th 445, 453 (2d Cir. 2022) (emphasis in original).

Plaintiff has submitted no opposition to the instant motion and has not argued that administrative procedures were unavailable to him. *See Dowling v. Barkman*, No. 17-CV-647, 2019 WL 7971868, at \*5 (N.D.N.Y. Dec. 20, 2019) ("Given Plaintiff's failure to oppose the Motion, no basis appears on the record for concluding that DOCCS' grievance procedure was unavailable to him."), *report and recommendation adopted sub nom. Dowling v. Schleicher*, 2020 WL 103480 (N.D.N.Y. Jan. 8, 2020). Even if that were not the case, the record does not reflect that any of the above-listed circumstances apply.

First, nothing in the record suggests that Plaintiff did not receive a response from CORC because the grievance process was operating as a "dead end" – rather, it appears that CORC never received Plaintiff's appeal because of Plaintiff's failure to send the appeal to the appropriate official. (*See* P's Depo. at 80:24-81:4; Seguin Decl. ¶¶ 12-13; ECF No. 71-8.) Similarly, the record is bereft of evidence that the IGP is unavailable to inmates generally. *See White v. Veile*, 709 F. App'x 35, 38 (2d Cir. 2017) (summary order) (affirming summary judgment for failure to exhaust administrative remedies where plaintiff did not "present[ ] any evidence about the outcomes in the grievance system in general" or "show[ ] that prison officials are consistently unwilling to grant relief").

Second, as set out above, the relevant procedures are not opaque. The IGP clearly sets out the process for appealing a grievance to CORC through the Inmate Grievance Clerk – including the instructions under § 701.6(h)(2) for an inmate who has been transferred from one facility to another to send

an appeal to the appropriate facility's IGP Supervisor. Plaintiff testified that he is familiar with the grievance process, (*see* P's Depo. at 18:3-19:6), and the Superintendent's denial stated that the appeal to CORC had to go through the Inmate Grievance Clerk, (*see* ECF No. 71-7).

**\*6** Third, while there is some evidence in the record that Plaintiff sought information from the "law library officer" while he was in the SHU at Elmira and appears to have been given a mailing address for CORC, [8] this fact alone is insufficient to establish that a prison official thwarted his ability to successfully appeal to CORC. Plaintiff has not suggested that he asked how to appeal and was told to mail his appeal to CORC, or that he asked the law library officer for anything other than the address of CORC. There is simply no evidence of machination, intimidation or misrepresentation.

That the breakdown of the grievance procedure here was due to Plaintiff's failure to follow it, rather than to its unavailability, is highlighted by the fact that when Plaintiff did not receive confirmation that CORC was in possession of his appeal within the forty-five days envisioned by the regulations, instead of following the IGP and writing to Sing Sing's IGP Supervisor – an official with whom he had recently communicated, (*see* P's Depo. at 79:22-80:13, 81:14-21) – to confirm that the appeal was filed, *see* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(d)(3)(i), he simply waited a few months and then filed this lawsuit. (P's Depo. at 79:25-80:8, 81:5-13). [9]

In short, "[g]iven the lack of evidence that Plaintiff's appeal to CORC was ever filed, or ever followed up on, it is not that the full scope of administrative remedies was not available to Plaintiff – rather, Plaintiff failed to fully exhaust the administrative remedies available to him." *Houston v. Coveny*, No. 14-CV-6609, 2020 WL 2494439, at \*3 (W.D.N.Y. May 14, 2020); *see Litchmore v. Williams*, No. 11-CV-7546, 2013 WL 3975956, at \*6 (S.D.N.Y. Aug. 5, 2013) (no "sufficient basis in the record to find that administrative remedies were unavailable" where, among other things, there was "no evidence here that the plaintiff's appeal was actually mailed, intercepted, or ignored" and "DOCCS has no record of any appeal filed with CORC"). [10]

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion, (ECF No. 83), enter judgment for Defendants, and close the case.

**SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 3020254

## Footnotes

1    Plaintiff did not file a responsive Rule 56.1 Statement or any papers in opposition to this motion. Local Civil Rule 56.1 requires that the party opposing a motion for summary judgment submit a counterstatement responding to the moving party's statement of material facts, indicating which facts are admitted and which the opposing party contends are in dispute and require a trial. L.R. 56.1(b). Under the Local Rule, "[i]f the opposing party ... fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003) (citing L.R. 56.1(c)). *Pro se* litigants are not excused from this requirement. *SEC v. Tecumseh Holdings Corp.*, 765 F. Supp. 2d 340, 344 n.4 (S.D.N.Y. 2011). As Defendants served Plaintiff with the requisite notice pursuant to Local Civil Rule 56.2, (*see* ECF No. 72), I have discretion to consider any properly supported facts in Defendants' Local Civil Rule 56.1 Statement admitted. (The Court will send Plaintiff copies of any unpublished decisions cited in this Opinion and Order.) But granting Plaintiff solicitude, I have considered his deposition testimony, (ECF No. 71-2 ("P's Depo.")), statements in his complaint and amended complaint, both of which are sworn under penalty of perjury pursuant to 28 U.S.C. § 1746, (ECF Nos. 2, 30), and his letter in response to Defendants'

pre-motion letter, (ECF No. 65). *See* 🏴 *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]hile a court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement.") (cleaned up).

2    Defendants move for summary judgment on all of Plaintiff's claims on the ground that he failed to exhaust his administrative remedies, and in the alternative for summary judgment only on Plaintiff's deliberate medical indifference claim. (*See* ECF No. 67 at 1.) Because I resolve the motion on the basis of failure to exhaust administrative remedies, I do not describe the specific allegations further.

3    Defendants state in their Rule 56.1 statement that Plaintiff's grievance is dated April 22, 2019, but that is the date on which the grievance was stamped as received by the facility. (*See* ECF No. 71-6.)

4    The form is captioned "Appeal Statement," and below the caption it reads: "If you wish to refer the above decision of the Superintendent please sign below and return this copy to your Inmate Grievance Clerk. You have seven (7) calendar days from your receipt of this notice to file your appeal.* Please state why you are appealing this decision to C.O.R.C." The asterisk leads to a statement about how to request an exception to the time limit. Below the language quoted above are several lines for the inmate to explain why he is appealing, and then signature lines for the inmate and the Grievance Clerk.

5    Plaintiff notes that it is possible he had not previously received the Superintendent's denial because much of the time he was at Sing Sing he was housed in the Office of Mental Health ("OMH") unit after several suicide attempts between June and September of 2019. (P's Depo. at 78:5-19.)

6    Plaintiff responded by letter dated November 8, 2021, but that letter was not received and docketed until November 24, 2021. (*See* ECF No. 65.)

7    The procedure to appeal to CORC under the normal, non-expedited procedures is the same. *See* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(d)(1)(i).

8    Plaintiff testified as his deposition as follows:

    [Q.] So how do you know where to send the grievance appeal? ...

    A. You can actually get the address from the law library that they provide in the facility. They have all the information of addresses, names, stuff like that.

    Q. And is that what you did? You went to the law library?

    A. Yes, ma'am. I was in the special housing unit at the time, so the law library officer will actually come to you and take your request and then return the request by the next day.

    (P's Depo. at 82:6-19.)

9    Plaintiff's response to the question whether he ever followed up with CORC – that he "tried checking [the appeal], but it had already been months they hadn't responded, so I proceeded with my civil Complaint," (P's Depo. at 81:8-13) – not only contains no information about what he did to check, but suggests at most that he asked about the status of his appeal at or about the same time that he filed this lawsuit.

10    Having so found, I need not and do not address the merits of Plaintiff's medical indifference claim.

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 3948100
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jonathan MENA, Plaintiff,

v.

CITY OF NEW YORK, et al., Defendants.

No. 13-cv-2430 (RJS)
|
Signed 07/19/2016

**Attorneys and Law Firms**

Jonathan Mena, Stormville, NY, pro se.

Omar Javed Siddiqi, Ryan Glenn Shaffer, New York City Law Department, New York, NY, for Defendants.

OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge

**\*1** Plaintiff Jonathan Mena, who is currently incarcerated and proceeding *pro se*, brings this action pursuant to 📄 42 U.S.C. § 1983 ("📄 Section 1983") against Correction Officer Benjamin Eason ("Defendant"), alleging violations of the Eighth Amendment. Now before the Court is Defendant's motion for summary judgment. For the reasons set forth below, the motion is granted.

I. BACKGROUND

A. Facts [1]

On September 9, 2012, while incarcerated at the Otis Bantum Correctional Center ("OBCC") on Rikers Island, Plaintiff was placed in an intake cell in the OBCC's receiving area, which he shared with two other individuals. (56.1 Stmt. ¶¶ 2–3.) Plaintiff alleges that the cell was extremely cold, vermin-infested, and too small to accommodate three men. (See Doc. No. 54-1 ("Compl.") 4, 8.) Plaintiff further alleges that these conditions, coupled with the constant noise made by the two other inmates, prevented him from sleeping for the entire 60-hour period that he was held in the cell. (See id. at 4.) Consequently, he asked Defendant, who was on duty, to

transfer him to a different cell. (56.1 Stmt. ¶¶ 7–8.) According to Plaintiff, Defendant responded that there was "nothing he could do" about the situation. (Id. ¶ 9; see also Doc. No. 54-2 ("Mena Dep.") 59:5-8.)

Plaintiff avers that he filed a grievance with the OBCC to complain about his experience in the cell. (See Compl. at 7.) The New York City Department of Correction ("DOC") has an administrative grievance procedure, known as the Inmate Grievance and Request Program ("IGRP"), for inmates housed at facilities such as the OBCC. The IGRP, which was available and in effect at all times relevant to this lawsuit, requires that inmates first file a complaint with the Inmate Grievance Resolution Committee ("IGRC") within ten days of the complained-of act. (56.1 Stmt. ¶¶ 11–12; see also Doc. No. 54-3 ("IGRP Directive") § IV(D)(1).) The IGRC then attempts to resolve the grievance informally within five days, and if the grievance is not informally resolved, then the inmate may request a formal hearing before the IGRC. (56.1 Stmt. ¶ 12; see also IGRP Directive §§ IV(G)-(H).) An inmate may appeal the IGRC's decision to the commanding officer, or her designee, and subsequent appeals may be taken to the Central Office Review Committee ("CORC"). (56.1 Stmt. ¶ 13; see also IGRP Directive §§ IV(I)-(J).) The CORC's decision is the final and binding decision of the DOC; if an inmate disputes the decision of the CORC, he may independently appeal to the Board of Correction. (IGRP Directive at 47.) Finally, if an inmate does not receive a timely disposition at any point throughout the grievance process, he has the option of either granting an extension of time to the relevant decisionmaker (i.e., the IGRC, the commanding officer, or the CORC) or appealing and proceeding to the next level of review. (56.1 Stmt. ¶ 14; see also IGRP Directive §§ IV(D)(9)(b), (10).)

**\*2** As Plaintiff himself acknowledges, after submitting the grievance and receiving no response, he neither granted the DOC an extension of time nor appealed. (See Compl. 7–8; Opp'n 6.) In his Complaint, Plaintiff admits that he is "still waiting" for a disposition of his grievance, but does not indicate any steps he has taken to appeal any decision before the IGRC. (See Compl. 7.) In response to a question on the Southern District of New York Prison Complaint form asking a plaintiff to "set forth any additional information that is relevant to the exhaustion of your administrative remedies," Plaintiff repeated a number of his substantive allegations against the OBCC staff, but did not state any information relevant to the grievance process. (Id. at 5.) And in his opposition brief in connection with this motion, Plaintiff again notes that he filed "several grievances about the issues

in question," but he does not indicate any specific steps he took to appeal to the IGRC or to pursue any other avenue of appellate review within the IGRP. (Opp'n 6.)

### B. Procedural History

On April 11, 2013, Plaintiff commenced this action by filing a complaint against the City of New York, Correction Officer Jaquon Pickwood ("Pickwood"), Correction Officer Sauda Abdul-Malik ("Abdul-Malik"), and Defendant (collectively, "Defendants"), pursuant to Section 1983, asserting violations of his constitutional rights under the Eighth and Fourteenth Amendments. (*See* Doc. No. 1.) On December 9, 2013, Defendants moved to dismiss the Complaint. (Doc. No. 18.) On September 17, 2014, the Court granted Defendants' motion to dismiss with respect to Plaintiff's claims against the City of New York, Pickwood, and Abdul-Malik, and Plaintiff's Fourteenth Amendment claims against Defendant for failure to state a claim upon which relief can be granted, but denied Defendants' motion to dismiss with respect to Plaintiff's Eighth Amendment claim against Officer Eason. (Doc. No. 29.) On September 11, 2015, following the completion of discovery, Defendant filed the instant motion for summary judgment, along with his brief and his 56.1 Statement, arguing that Plaintiff failed to exhaust administrative remedies, that his Eighth Amendment conditions of confinement claim failed on the merits, and that in any event, Defendant was entitled to qualified immunity. (Doc. Nos. 53–55, 57.) Defendant also filed a notice pursuant to Local Civil Rule 56.2 alerting Plaintiff of his obligation to submit a responsive statement and informing him of the consequences of not doing so. (Doc. No. 56.) In accordance with Local Rule 56.2, this notice included copies of Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1. (*Id.*) On October 14, 2015, Plaintiff filed a brief opposing summary judgment and submitted several exhibits (*see* Doc. No. 58), but he failed to submit a responsive 56.1 Statement. Defendant submitted his reply on October 22, 2015. (Doc. No. 59 ("Reply").)

### II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see* Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." Weyant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," Binder & Binder PC v. Barnhart, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," Anderson, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party " 'show[s]– that is, point[s] out ... – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *See* Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

**\*3** Typically, a "nonmoving party's failure to respond to a [Local Civil] Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible." T.Y. v. N.Y.C. Dep't of Educ., 584 F.3d 412, 418 (2d Cir. 2009) (citing Gubitosi v. Kapica, 154 F.3d 30, 31 n.1 (2d Cir. 1998)). "This general rule

applies equally" to cases involving a *pro se* nonmoving party who has been provided adequate notice of the consequences of failing to properly respond to a summary judgment motion.

*Pierre-Antoine v. City of N.Y.*, No. 04-cv-6987 (GEL), 2006 WL 1292076, at *3 (S.D.N.Y. May 9, 2006); *see also Gilliam v. Trustees of Sheet Metal Workers' Nat'l Pension Fund*, No. 03-cv-7421 (KMK), 2005 WL 1026330, at *1 n.2 (S.D.N.Y. May 3, 2005). Even so, the Court "may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement," *Holtz*, 258 F.3d at 73, and the Court is obligated to construe *pro se* litigants' submissions liberally, *see McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004).

Here, Plaintiff failed to submit a responsive Rule 56.1 statement, even though Defendant, pursuant to Local Civil Rule 56.2, sent Plaintiff notice of his obligations under Local Civil Rule 56.1 and Federal Rule of Civil Procedure 56 and sent copies of both rules. (Doc. No. 56). In light of Plaintiff's *pro se* status, the Court has exercised its discretion to independently review the record, which reveals no controverted facts. *See Holtz*, 258 F.3d at 73. In fact, as discussed below, Plaintiff's own submissions confirm the material facts contained in Defendant's Rule 56.1 Statement.

## III. DISCUSSION

Defendant argues that summary judgment should be granted because Plaintiff has failed to comply with the administrative exhaustion requirement of the Prison Litigation Reform Act of 1995 (the "PLRA"). The Court agrees.

Under the PLRA, inmates bringing claims with respect to prison conditions under Section 1983 must exhaust the administrative remedies that are available at that prison before proceeding in federal court. 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is "mandatory," thus "foreclosing judicial discretion." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) (describing the "invigorated exhaustion provision" as "[a] centerpiece of the PLRA's effort to reduce the quantity of prisoner suits" (citations and quotation marks omitted)). Accordingly, "the law is well-settled that the failure to take an available administrative appeal, even when the

initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin v. Rivera*, No. 13-cv-7054 (RJS), 2015 WL 3999180, at *3 (S.D.N.Y. June 29, 2015); *accord Johnson v. N.Y.C. Dep't of Corr.*, No. 13-cv-6799 (CM), 2014 WL 2800753, at *6 (S.D.N.Y. June 16, 2014) ("Assuming that [p]laintiff filed a timely grievance ... and received no response within five business days[,] ... [p]laintiff ... could have taken the next step and requested a hearing."); *Leacock v. N.Y.C. Health Hosp. Corp.*, No. 03-cv-5440 (RMB) (GWG), 2005 WL 483363, at *7 (S.D.N.Y. Mar. 1, 2005) ("[T]hat [plaintiff] allegedly did not receive a response to her grievance does not excuse her from failing to exhaust the appellate remedies available to her."); *Burns v. Moore*, No. 99-cv-966 (LMM) (THK), 2002 WL 91607, at *8 (S.D.N.Y. Jan. 24, 2002) ("Thus, even if [p]laintiff received no response to his initial grievance, [p]laintiff could have sought the next level of review, in this case, to the prison superintendent.").

**\*4** At the OBCC, where Plaintiff was incarcerated, an inmate must exhaust several layers of review, even if the inmate does not receive a timely disposition at the initial stages. (56.1 Stmt. ¶ 12–14.) Here, as Plaintiff reveals in his own complaint and brief in opposition to the motion for summary judgment, he did not exhaust the OBCC administrative procedure. (Compl. 7–8; Opp'n 6.) Rather, he indicates that he filed a grievance but otherwise did not appeal or seek further review through the IGRP process. (Compl. 7–8 (noting that he is "still waiting" for disposition of his grievances and did not seek review at the next levels within IGRP); Opp'n 6 (noting that he filed "several grievances about the issues in question," but omitting reference to any specific steps taken to appeal)). Accordingly, Plaintiff failed to satisfy the PLRA exhaustion requirement.

The Court next considers whether there is any basis for excusing Plaintiff's failure to exhaust administrative remedies at the IGRP. Last month, the Supreme Court forcefully disapproved of judge-made exceptions to the PLRA's exhaustion requirement, stressing the mandatory language of the statute. *See Ross*, 136 S. Ct. at 1862 ("Courts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement.") In doing so, the Supreme Court expressly rejected the Second Circuit's prior framework under *Giano v. Goord*, 380 F.3d 670 (2d Cir. 2004), and, by extension, *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004), which recognized a

Case 9:22-cv-00541-MAD-ML   Document 38   Filed 04/19/23   Page 39 of 51

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

"special circumstances" exception to the PLRA's exhaustion requirement. *See Williams v. Priatno*, No. 14-4777, ___ F.3d. ____, ____, 2016 WL 3729383, at *4 (2d Cir. July 12, 2016) ("[T]o the extent that our special circumstances exception ... permits plaintiffs to file a lawsuit in federal court without first exhausting administrative remedies that were, *in fact*, available to them, those aspects of *Giano* and *Hemphill* are abrogated by *Ross*.").

Thus, post-*Ross*, the lone surviving exception to the PLRA's exhaustion requirement is that embedded in its text: that an inmate need only exhaust those administrative remedies that are "available" to him. *Ross, 136 S. Ct. at 1862*; *see also* 43 U.S.C. § 1997e(a). An inmate's failure to exhaust may therefore be excused when his prison's grievance mechanisms are literally or constructively "unavailable." *Ross, 136 S. Ct. at 1858–59*. The Supreme Court described three scenarios in which administrative procedures could be "officially on the books," but "not capable of use to obtain relief," and therefore unavailable. *Id.* While not exhaustive, these illustrations nonetheless guide the Court's inquiry. *See Williams, 2016 WL 3729383, at *4 n.2*. First, an administrative procedure is unavailable when "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to inmates." *Ross, 136 S. Ct. at 1859*. If prison administrators either lack the necessary authority to provide any relief or possess authority but consistently decline to exercise it, the administrative channels are not "available" within the meaning of the PLRA. *Id.*; *see also Booth v. Churner*, 523 U.S. 731, 736, 738 (2001) ("[T]he modifier 'available' requires the possibility of some relief."). Second, an administrative procedure is unavailable where it is "so opaque that it becomes, practically speaking, incapable of use." *Id.* To meet this high bar, the administrative remedy must be "essentially 'unknowable.' " *Id.* Finally, "a grievance process is rendered unavailable when prison administrators thwart inmates from taking advantage of it through machination, misrepresentation, or intimidation." *Ross, 136 S. Ct. at 1860*.

Here, Plaintiff has not alleged – let alone shown – that the administrative procedures at the OBCC were unavailable to him. Although Plaintiff's initial grievance received no response, this alone is insufficient to show that the IGRP acted as a mere dead end. As stated earlier, "the law is well-settled" that an inmate's "failure to take an available administrative appeal, even when the initial grievance receives no response,

constitutes a failure to exhaust available administrative remedies." *Garvin, 2015 WL 3999180, at *3* (collecting authorities). In short, the DOC's untimeliness in this case is not enough to demonstrate the unavailability of an administrative remedy. This is especially true in light of the IGRP's built-in appeal mechanism, whereby inmates may directly proceed to the next level of review in the event of the DOC's failure to respond to a grievance. (*See* IGRP Directive § IV(D)(9)(b), (10).) Furthermore, Plaintiff has not introduced any facts to indicate that prison officials at OBCC are "consistently unwilling to provide any relief to aggrieved inmates." *Ross, 136 S. Ct. at 1859*.

**\*5** Nor has Plaintiff pointed to any evidence that the IGRP was "so opaque that it [became], practically speaking, incapable of use" and therefore "essentially unknowable." *Ross, 136 S. Ct. at 1859*. While the Second Circuit recently found that certain administrative grievance procedures at a different New York State facility met this standard, the Second Circuit's decision hinged on the "extraordinary circumstances" specific to the case before it, for which the applicable grievance regulations gave "no guidance whatsoever." *See Williams, 2016 WL 3729383, at *1, *5*. Specifically, the plaintiff in *Williams* was housed in a special housing unit and segregated from the regular prison population; therefore, he gave his grievance complaint to a correction officer to file on his behalf. *Williams, 2016 WL 3729383, at *2*. However, the plaintiff in *Williams* alleged that the correction officer to whom he gave his complaint failed to file it, *id.*, and because the Second Circuit concluded that the applicable grievance regulations gave "no guidance whatsoever to an inmate whose grievance was never filed," *id.* at 5, it reversed the District Court's dismissal for failure to exhaust. Here, by contrast the IGRP expressly guides inmates in Plaintiff's position who have filed a grievance but have not received a timely response and directs them to either grant an extension of time to the relevant decisionmaker or to appeal to the next level of review. (*See* IGRP Directive §§ IV(D)(9)(b), (10).) In light of the IGRP's unambiguous directive, Plaintiff has clearly failed to show that the IGRP was "essentially unknowable." *See Ross, 136 S. Ct. at 1859*.

Finally, the Court turns to the third scenario contemplated by the Supreme Court, in which "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859. Plaintiff has not demonstrated, or even suggested,

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

Case 9:22-cv-00541-MAD-ML    Document 38    Filed 04/19/23    Page 40 of 51

that prison administrators obstructed or interfered with his access to administrative remedies. *See, e.g.,* 🚩*Winston v. Woodward*, No. 05-cv-3385 (RJS), 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (concluding that plaintiff's failure to exhaust administrative remedies was not excused in light of his "failure to put forth any corroborating evidence, either direct or circumstantial, to support his claims that he suffered retaliation in the form of threats, harassment and mail tampering"). Thus, this exception to the exhaustion requirement is also clearly inapplicable.

Therefore, the Court concludes, as a matter of law, that Plaintiff has failed to exhaust administrative remedies available to him through the IGRP and has failed to offer any facts to prove that administrative remedies were not available to him. Because Plaintiff's claims are barred for failure to comply with the administrative exhaustion requirement of the PLRA, Defendant's motion for summary judgment is granted. [2]

## IV. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED that Defendant's motion for summary judgment is GRANTED.

Although Plaintiff has paid the filing fee in this action and has not applied to proceed *in forma pauperis*, the Court nevertheless certifies pursuant to 🚩28 U.S.C. § 1915(a)(3) that, in the event Plaintiff seeks to appeal this Order *in forma pauperis*, any appeal would not be taken in good faith.

The Clerk is respectfully directed to terminate the motion pending at docket number 53, to mail a copy of this order to Plaintiff, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3948100

## Footnotes

1    The following facts are drawn from Defendant's unopposed Local Civil Rule 56.1 Statement. (Doc. No. 55 ("56.1 Statement" or "56.1 Stmt.").) In deciding Defendant's motion for summary judgment, the Court has also considered Plaintiff's submission in opposition to summary judgment (Doc. No. 58 ("Opp'n")), and has conducted an independent review of the record, notwithstanding Plaintiff's failure to submit a statement compliant with Local Civil Rule 56.1. *See* 🚩*Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d. Cir. 2001) (noting that district court "may in its discretion opt to conduct an assiduous review of the record even when" a party has failed to comply with Local Civil Rule 56.1 (citations and quotation marks omitted)).

2    Although Defendant has raised other grounds for summary judgment, including that Plaintiff has failed to establish an Eighth Amendment conditions of confinement claim, and that Defendant is entitled to qualified immunity, the Court finds it unnecessary to address these other arguments because of Plaintiff's failure to exhaust remedies.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by   In re Payment Card Interchange Fee and Merchant
Discount Antitrust Litigation,   E.D.N.Y.,   October 26, 2022

2004 WL 3691343

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Michael DEVITO, Plaintiff,

v.

SMITHKLINE BEECHAM CORPORATION

d/b/a Glaxosmithkline, Defendant.

No. Civ.A. 02–CV–0745NPM.

|

Nov. 29, 2004.

**Attorneys and Law Firms**

De Lorenzo Law Firm, LLP, Schenectady, New York, for
Plaintiff, Scott Lieberman, of counsel.

Phillips Lytle, LLP, Buffalo, New York, for Defendant, Paul
B. Zuydhoek, of counsel.

King & Spalding, LLP, Atlanta, Georgia, for Defendant,
Chilton D. Varner, of counsel.

*MEMORANDUM–DECISION AND ORDER*

MCCURN, Senior J.

I. Preclusion Motion.................................................................................................. 4

A. Standard for Admissibility of Expert Evidence............................................. 6

1. Deborah L. Sweeney................................................................................... 9

a. Qualified?.................................................................................................. 9

2. Kevin W. George, M.D................................................................................ 10

3. James T. O'Donnell..................................................................................... 13

a. General Causation...................................................................................... 14

i. Qualified?................................................................................................... 14

ii. Reliability of Testimony?............................................................................ 17

b. Specific Causation..................................................................................... 19

c. Warnings.................................................................................................... 19

i. Qualified?................................................................................................... 20

ii. Reliability of Testimony?............................................................................ 22

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.        1

II. Summary Judgment Motion........................................................................................... 24

### Introduction

**\*1** "Between 1987 and 1997, the percentage of Americans being treated for depression more than tripled nationwide[.]" Shankar Vedantam, *Report Shows Big Rise in Treatment for Depression,* WASH. POST,, Jan. 9, 2002, at A01. In December 1996, plaintiff Michael DeVito became one of those Americans. At that time, his primary care physician prescribed Paxil, a selective serotonin reuptake inhibitor ("SSRI"). Mr. DeVito takes Paxil to this day, despite attempts through the years to discontinue. DeVito claims that he cannot discontinue taking Paxil because he has become "dependent" upon it. Affidavit of Robert E. Glanville (Oct. 20, 2003), exh. A thereto (Complaint) at 2, ¶ 9. More specifically, plaintiff alleges that he has been unable to stop taking Paxil due to what he characterizes as "withdrawal reactions" or "dependency/withdrawal syndrome," which according to plaintiff "includ[es], but [is] not limited to, dizziness, nausea, shaking, electrical-like shocks and horrible dreams." *Id.* at 2, ¶¶ 7 and 6.

In this lawsuit plaintiff alleges five causes of action against the manufacturer of Paxil, defendant Smithkline Beecham Corporation d/b/a Glaxo Smithkline ("Glaxo"): (1) fraud; (2) negligence; (3) strict liability; (4) breach of express warranty; and (5) breach of implied warranty. There is a great deal of overlap among these five causes of action. The thrust of plaintiff's complaint is that Glaxo failed to adequately warn of "Paxil's addictive qualities and dependency/withdrawal characteristics[.]" *Id.* at 6, ¶ 19; *see also id.* at 3, ¶ 11b); at 7, ¶ 25; and at 8, ¶ 33. [1]

Discovery is complete and Glaxo is now moving for summary judgment pursuant to Fed.R.Civ.P. 56. Pursuant to Fed.R.Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S .Ct. 2786 (1993), Glaxo is also moving to preclude the testimony of the three witnesses whom plaintiff is proffering as experts. The court will address Glaxo's motion to preclude first because if any or all of the proffered testimony is inadmissible, then that could significantly impact Glaxo's summary judgment motion in terms of the admissible proof before the court. *See Toole v. Toshin Co. Ltd .,* No. 00–CV–821S, 2004 WL 2202580, at \*4 (W.D.N.Y. Sept. 29, 2004) (granting defense motion to preclude testimony

of plaintiff's expert and declining to consider his report on summary judgment motion).

### I. Preclusion Motion

Each of the five causes of action which plaintiff alleges requires him to prove causation. "Under settled New York law, whether the action is pleaded in strict products liability, breach of warranty or negligence, the plaintiff in a products liability case bears the burden of establishing that a defect in the product as a substantial factor in causing the injury." *Prohaska v. Sofamor, S.N.C.,* 138 F.Supp.2d 422, 434 (W.D.N.Y.2001) (internal quotation marks and citation omitted). Common law fraud likewise "requires a showing of proximate causation, such that the injury is the natural and probable consequence of the defrauder's misrepresentation or ... the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud." *Cyber Media Group, Inc. v. Island Mortgage Network, Inc.,* 183 F.Supp.2d 559, 580 (E.D.N.Y.2002) (internal quotation marks and citation omitted). To establish causation here, plaintiff DeVito "must offer admissible testimony regarding *both general causation," i.e.* that Paxil can cause the type of symptoms of which plaintiff complains when attempting to discontinue that drug, *"and specific causation," i.e.* that Paxil actually caused DeVito's alleged symptoms upon discontinuation of Paxil. *See Amorgianos v. National Railroad Passenger Corporation,* 303 F.3d 256, 268 (2d Cir.2002) (citation omitted) (emphasis added); *see also Blanchard v. Eli Lilly & Co.,* 207 F.Supp.2d 308, 314 (D . Vt.2002) (citations omitted) ("Plaintiffs ... must prove both general and specific causation in order to prevail on their claim, that is, that Prozac is capable of causing and in fact did cause the deaths in this case."). In the context of Paxil litigation, "the general causation question is limited to whether discontinuation from Paxil is *capable* of causing dizziness, agitation, anxiety, nausea, etc." *In re Paxil Litigation,* 218 F.R.D. 242, 249 (C.D.Cal.2003). Specific causation, on the other hand, focuses on whether a plaintiff can "prove that [his] symptoms came from Paxil, as opposed to, for example, the relapse of the underlying illness or the consumption or discontinuation of other drugs." *Id.*

**\*2** To establish causation, plaintiff DeVito seeks to offer the testimony of three "expert" witnesses: (1) Mr. John T.

O'Donnell, a pharmacist with a Master's Degree in nutrition; (2) Dr. Kevin W. George, a former psychiatrist of plaintiff's; and (3) Ms. Deborah Sweeney, plaintiff's treating nurse practitioner. Glaxo is seeking to "preclude ... [these] experts from offering any opinion that: (I) Paxil causes substance dependence, or is either addictive or habit-forming; or (ii) that plaintiff is addicted to Paxil or has developed substance dependence as a result of taking it." Memorandum of Law in Support of Glaxosmithkline's Motion to Preclude Plaintiff's Experts' Testimony Pursuant to Fed.R.Evid. 702 and *Daubert* ("Def. Preclude Memo.") at 4. In preparation for trial, each of these witnesses has been deposed and Mr. O'Donnell has provided an "expert" report on plaintiff's behalf. Apart from these witnesses, plaintiff proffers no other causation evidence.

To support his theory that Paxil is defective due to an inadequate warning, plaintiff is relying solely upon the deposition testimony and "expert" report of Mr. O'Donnell. Glaxo argues for the preclusion of "[h]is warnings 'opinions' " because O'Donnell is not qualified to testify on that issue and even if he were, "his opinions are neither reliable nor scientific." Def. Preclude Memo. at 24.

A. Standard for Admissibility of Expert Evidence

There is a two-part inquiry in deciding the admissibility of expert evidence. First, in accordance with Fed.R.Evid. 702, "[t]he court should admit specialized expert testimony if the witness is 'qualified as an expert by knowledge, skill, experience, training or education' and his testimony 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' " *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 746 (2d Cir.1998) (quoting Fed.R.Evid. 702); *see also Kass v. West Bend Company,* No. 02–CV–3719, 2004 WL 2475606, at *4 (E.D.N.Y. Nov. 4, 2004) (citation omitted) ("As a threshold matter, the court must examine [the witness'] qualifications to testify about alternative ... designs.") Second, "in the form of an opinion or otherwise," the court must insure that "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. In other words, whether an expert witness' "opinion is ultimately admissible depend on the reliability and relevance of the proffered testimony." *Kass,* 2004 WL 2475606, at *5.

In this regard, the Supreme Court has instructed the by now oft-cited rule that a district court must act as "a gatekeeper to exclude invalid and unreliable expert testimony." *Bonton v. City of New York,* No. 03 Civ. 2833, 2004 WL 2453603, at *2 (S.D.N.Y. Nov. 3, 2004) (citation omitted). This gatekeeping obligation applies whether the proposed expert testimony is based upon scientific knowledge, "technical," or some other "specialized" knowledge. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 1171 (1999) (citing Fed.R.Evid. 702). As with other types of evidence, the court must also bear in mind that under Rule 403, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury." Fed.R.Evid. 403. In *Daubert* the Supreme Court soundly reasoned that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the *judge* in weighing possible prejudice against probative force under Rule 403 ... *exercises more control over experts than over lay witnesses.*" *Daubert,* 509 U.S. at 595, 113 S.Ct. at 2798 (quotation marks and citation omitted) (emphasis added). Finally, it should be noted that "[t]he proponent of expert evidence must establish admissibility under Rule 104(a) of the Federal Rules of Evidence by a preponderance of the proof." *Bonton,* 2004 WL 2453603, at *2 (citing *Bourjaily v. United States,* 483 U.S. 171, 175–76 (1987)). This burden is the same regardless of whether the issue is the "qualification[s] of a person to be a witness, ..., or the admissibility of the evidence" itself. Fed.R.Evid. 104(a). In the present case, this requires plaintiff Devito to prove by a preponderance of the evidence that each of the three witnesses whom he is proposing to call as an expert qualify as such; *and* that the proposed testimony of each is admissible.

**\*3** "In assessing expert qualifications, '[l]iberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications.' " *Kass,* 2004 WL 2475606, at *4 (quoting *Lappe v. American Honda Motor Co., Inc.,* 857 F.Supp. 222, 227 (N.D.N.Y.1994) *aff'd* 101 F.3d 682 (2d Cir.1996)). "So long as the expert stays within the 'reasonable confines of his subject area,' the expert can fairly be considered to possess the 'specialized knowledge' required by Rule 702." *Id.* (quoting *Lappe,* 857 F.Supp. at 227) (other citation omitted).

"In *Daubert,* the Supreme Court articulated four factors pertinent to determining the reliability of an expert's reasoning or methodology: (1) whether the theory or

technique relied on has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community." *Id.*

(citing 🔖 *Daubert,* 509 U.S. at 593–94, 113 S.Ct. at 2796–97). "These factors do not, however, constitute a 'definitive checklist or test.' " *Id.* (quoting 🔖 *Daubert,* 509 U.S. at 593, 113 S.Ct. at 2796). "Rather, they are intended to be applied flexibly, depending on the particular circumstances of the particular case at issue." *Id.* (citing 🔖 *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. at 1175).

In *Kumho,* the Supreme Court recognized that "when evaluating the admissibility of non-scientific expert testimony, the standard under Rule 702 is a liberal and flexible one, and the factors outlined in *Daubert* are merely guidelines in aiding a court's reliability determination." *Houlihan v. Marriott International, Inc.,* No. 00 Civ. 7439, 2003 WL 22271206, at \*3 (S.D.N.Y. Sept. 30, 2003) (citing 🔖 *Kumho,* 526 U.S. at 151, 119 S.Ct. at 1175). "For example, in some cases, reliability concerns may focus on personal knowledge or experience rather than strict scientific methods." *Id.* (citation omitted). Regardless of which criteria a court applies to assess the admissibility of expert testimony, "the Supreme Court has made clear that the district court has a 'gatekeeping function' under Rule 702—is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.' ' 🔖 *Amorgianos,* 303 F.3d at 265 (quoting 🔖 *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786) (other citation omitted). Finally, it should be noted that " 'the gatekeeping inquiry must be tied to the facts of a particular case[.]' " *Id.* at 266 (quoting 🔖 *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. at 1175).

1. Deborah L. Sweeney

a. Qualified?

Glaxo's motion to preclude the testimony of Ms. Sweeney [2] requires little if any analysis. Glaxo is moving to preclude her testimony because it does not believe she is qualified to testify as an expert. Additionally, Glaxo contends that "her proposed opinion lacks a reliable scientific foundation." Def. Preclude Memo. at 26. Plaintiff did not bother to respond to this aspect of Glaxo's motion. This lack of response

amounts to a concession by plaintiff that the court should exclude Ms. Sweeney's testimony. *Cf. Green v. Doukas,* No. 97 CIV.8288CMGAY, 2001 WL 767069, at \*8 (S.D.N.Y. June 22, 2001) (granting motion to preclude expert testimony because "plaintiff's failure to oppose the motion suggests ... it has merit[ ]"). Accordingly, the court grants Glaxo's motion to the extent it is seeking preclusion of Ms. Sweeney's testimony. *See Amaker v. Coombe,* No. 96 Civ. 1622, 2003 WL 21222534, at \*6 (S.D .N.Y. May 27, 2003) (granting motion to preclude where plaintiff defaulted); *see also* ⚠ *Martinez v. Sanders,* No. 02 Civ.5624, 2004 WL 1234041, at \*3 (S.D.N.Y. June 3, 2004) (because plaintiff did not respond to motion, court granted same on "default" theory) (and cases cited therein).

2. Kevin W. George, M.D.

**\*4** Glaxo also seeks to preclude the testimony of Dr. Kevin George. Dr. George is a psychiatrist who saw Mr. DeVito in consultation twice—once on November 2, 2001 and again on December 13, 2001. Glanville Aff., exh. G thereto at 51 and 76.

Glaxo is not challenging Dr. George's qualifications, but rather the nature of his testimony. Glaxo is seeking to exclude Dr. George's testimony because he "has expressly disavowed all of the opinions that plaintiff ascribed to him in plaintiff's expert disclosure." Def. Preclude Memo. at 25. Further, even if Dr. George had not disavowed those opinions, Glaxo argues that his "proposed testimony [is] inadmissible because it lacks any reliable scientific foundation." *Id.*

Plaintiff's response focuses almost exclusively on Dr. George's qualifications, which are not in dispute. As to the opinions which plaintiff attributes to Dr. George, the sum total of plaintiff's response is that any alleged "shortcomings" in that testimony go to weight and credibility, and not to admissibility. Memorandum of Law in Opposition to Defendant's Motion to Preclude Plaintiff's Experts ("Pl. Opp'n to Preclude") at 5. The court disagrees. As will be seen, Dr. George's purported opinion testimony does not have simply a few "shortcomings." It has glaring holes in terms of reliability, not the least of which is Dr. George's unequivocal deposition testimony disavowing that he made the opinions which plaintiff claims he did.

In his expert disclosure plaintiff specifically identifies Dr. George as an "expert" whom he intends to call at the time

of trial. Glanville Aff., exh. E thereto at 1. According to plaintiff's expert disclosure, Dr. George will testify as follows:

> that in his opinion, within a degree of reasonable medical certainty, ... [1] the plaintiff is experiencing withdrawal reactions from the drug Paxil and that each time the plaintiff attempts to 'wean' himself off of the drug or to lower the dosage of the drug, the plaintiff experiences said withdrawal; 2) ... the plaintiff's withdrawal signs and symptoms are a result of the plaintiff ingesting Paxil; and 3) ... the plaintiff has sustained injury in that he has been unable to discontinue the use of Paxil and has been caused to suffer the signs and symptoms of the withdrawal syndrome associated with the use and attempted discontinuance of Paxil.

Glanville Aff., exh E thereto. Dr. George is confining his opinions to how Paxil allegedly *effected* plaintiff DeVito—not whether Paxil is *capable generally* of causing the symptoms of which DeVito complains. Therefore, although the plaintiff did not specify the purpose for which he is offering Dr. George's testimony, presumably it is being offered on the issue of specific causation.

As noted earlier, ordinarily once a court finds a witness qualified as an expert, the next issue is the admissibility of that witness' opinion testimony. Here, however, it appears that each of the opinions which plaintiff attributes to Dr. George have been expressly disavowed in his deposition. Dr. George was asked point blank whether he had formed any of the three opinions quoted above, and whether he was prepared to testify to same. Each time he answered no. *See* Glanville Aff., exh. G thereto at 88–91. Obviously, if Dr. George has not formed the opinions which plaintiff is ascribing to him, necessarily he has no foundation, scientific or otherwise, for same. Accordingly, the court excludes the opinion testimony outlined above which plaintiff is attributing to Dr. George.

**\*5** Even if Dr. George had not expressly disavowed the opinions set forth above, the court still must exclude his testimony. The crux of each of these opinions is that plaintiff

DeVito has "withdrawal reactions," or "withdrawal signs and symptoms" caused when he attempts to discontinue or taper below a certain dosage of Paxil. Glanville Aff., exh. E thereto. Dr. George's deposition testimony did not so state such. To be sure, Dr. George did testify that he used "Paxil withdrawal" as a *"label* to capture what [DeVito] was describing that he had been experiencing." *Id.,* exh. G thereto at 59 (emphasis added). When later in his deposition Dr. George was pressed as to whether or not he diagnosed plaintiff "as suffering from Paxil withdrawal [,]" he reiterated that he *"applied that label* to describe the symptoms that [DeVito] reported in relation to tapering Paxil." *Id.* at 102 (emphasis added).

There is an obvious difference between labeling a symptom which a patient describes and actually diagnosing that person. Significantly, Dr. George did *not* diagnosis plaintiff with Paxil withdrawal. Perhaps that is because "Paxil withdrawal is not a formal diagnosis within DMS–IV[.]" *Id.* at 94. ("The DSM–IV is the Diagnostic and Statistical Manual, the fourth revision of it, that psychiatrists generally base their diagnoses on." *Id.*) And, "[t]here is no criteria for diagnosing somebody with Paxil withdrawal." *Id.* at 60. For example, there are no "objective tests or assessments," aside from skin inspection for signs of sweating, "that could have been done to determine whether those reports [by DeVito] were genuine[.]" *Id.* at 62. So, Dr. George simply took plaintiff's description of his symptoms at "face value," and made no attempt to determine whether [DeVito's] report of those symptoms was genuine [.]" *Id.* at 62 and 79.

In light of the foregoing, even if Dr. George were inclined to testify that Paxil specifically caused the symptoms which plaintiff claims it did, there is no foundation for this testimony. What is particularly revealing in this regard is Dr. George's candor when asked: "Have you ever made any determination as to why Mr. DeVito's tapering off of Paxil may be taking longer than some of your other patients?" ' *Id.* at 100. Dr. George replied, "I had *no scientific way,* ..., of explaining why he was having such difficulty tapering off Paxil." *Id.* (emphasis added).

Further, plaintiff DeVito saw Dr. George in the latter's capacity as a treating psychiatrist. Thus, as is plain from Dr. George's deposition, he was concerned primarily with the symptoms of which plaintiff complained, not determining the underlying cause. *See* 🚩 *Munafo v. Metropolitan Transportation Authority,* Nos. 98 CV–4572, 00–CV–0134, 2003 WL 21799913, at \*19 (E.D.N.Y. Jan. 22, 2003). Had Dr. George been focusing on the underlying cause, undoubtedly

he would have performed a differential diagnosis, which "typically includes a physical examination, clinical tests, and a thorough case history." *Zwillinger v. Garfield Slope Housing Corp .,* No. CV 94–4009, 1998 WL 623589, at \*19 (E.D.N.Y. Aug. 17, 1998) (citations omitted). But, Dr. George did not. Without a differential diagnosis, specific causation cannot be established. *See id.* ("To establish specific causation, other possible causes for the symptoms experienced by plaintiff should be excluded by performing a 'differential diagnosis." ')

### 3. James T. O'Donnell

**\*6** Glaxo argues that the court must preclude O'Donnell's testimony for two reasons. First, he is not qualified as an expert as to the issues upon which he is being asked to opine— general and specific causation and the adequacy of the Paxil warnings. Second, even if he does qualify as an expert, Glaxo contends that the court should preclude his opinions because they lack the requisite scientific foundation and are otherwise unreliable. Plaintiff responds that O'Donnell's "experience and credentials are impressive [,]" whether the issue is his qualifications to testify as an expert on causation or as an expert on warnings. Pl. Preclude Memo. at 4. Plaintiff further responds that regardless of whether O'Donnell is opining on causation or warnings, any alleged "shortcomings" in that testimony go to "weight and credibility, and not [to] ... admissibility." *Id.* at 5 (citation omitted).

Plaintiff DeVito is offering O'Donnell's testimony on three separate issues, which require different areas of expertise. The court will examine O'Donnell's qualifications as to each.

### a. General Causation

Glaxo offers a host of reasons as to why O'Donnell "is not an 'expert' on scientific issues concerning general *or* specific causation" with respect to SSRIs or Paxil. Def. Preclude Memo. at 7 (emphasis added). All of these reasons have merit.

### i. Qualified?

This is not the first court to be confronted with the issue of whether Mr. O'Donnell is qualified to give an expert opinion here. In *Newton v. Roche Laboratories, Inc.,* 243 F.Supp.2d 672 (W.D.Tex.2002), the court found that he was *not* qualified to render an opinion on general causation. *Id.* at 679. There, the parents of a 16 year old girl claimed that Accutane, a prescription acne medication manufactured

by the defendant, caused or precipitated the onset of their daughter's schizophrenia. In much the same way plaintiff DeVito is offering O'Donnell's testimony here, the plaintiffs in *Newton* offered O'Donnell as an expert "to testify regarding general causation, *i.e.,* that Accutane is pharmacologically capable of causing schizophrenia." *Id.* at 677. After outlining a number of ways in which O'Donnell's qualifications were lacking, the court expressly found that he was not qualified to render such an opinion.

To support that conclusion, the *Newton* court relied upon O'Donnell's deposition testimony, which is substantially similar to his deposition testimony in this case. For example, O'Donnell testified in *Newton,* as he did here, that "he has never earned an M.D., a Ph.D., or any degree in pharmacology." *Id.* at 677; *see also* O'Donnell Dep'n at 24– 25 and 53. Yet, he "still holds himself out as a 'doctor' and a pharmacologist[.]" *Id.* As in *Newton,* "O'Donnell ... [continues to] grant[ ] himself the title of 'doctor' in reliance upon his Pharm.D degree, [which] he conceded in his deposition that in the majority of pharmacy schools, th[at] ... degree is 'an entry-level degree' that pharmacists must have to ... even practice pharmacy." *Id.* at 677 n. 2 (citation omitted); *see also* O'Donnell Dep'n at 24–25. In contrast, to obtain a degree in pharmacology usually three or four years of graduate school is required. O'Donnell Dep'n at 25– 26. O'Donnell did get a graduate degree, but it was not in pharmacology. O'Donnell's formal education consists of a four year degree in pharmacy and a Master's Degree in clinical nutrition. *Id.* at 27.

**\*7** In addition to questioning O'Donnell's background generally, the *Newton* court pointed out his "lack [of] appropriate pharmacological training relevant to the issues" therein, *i.e.* "Accutane, Vitamin A, schizophrenia, or psychosis[.]" *Id.* at 678. The same may be said here. There is no factual basis upon which this court can find that O'Donnell is an expert regarding SSRIs generally, not to mention Paxil or discontinuation of Paxil. Indeed, as his deposition testimony shows, O'Donnell's asserted expertise on these subjects is non-existent. *See id.* at 21, 24; 38–40; and 45.

Given that SSRIs are a fairly recently developed class of drugs, understandably they were not the subject of O'Donnell's course work as an undergraduate, or when getting his Master's Degree in nutrition. *Id.* at 21 and 24. Since that time, O'Donnell has done nothing to advance his own knowledge as to SSRIs generally or Paxil in particular. When directly asked if he had "done any clinical research

whatsoever relating to antidepressants," O'Donnell replied that he had not. *Id.* at 38. He responded the same way when asked if he had "done any scientific research concerning Paxil or SSRI antidepressants[.]" *Id.* at 39. Moreover, O'Donnell conceded that the first time he "review[ed] ... scientific literature in connection with Paxil discontinuation symptoms[ ]" was for this case. *Id.* at 40–41.

This is the sort of "litigation-drive expertise" which courts have eschewed. To illustrate, the court in *Mancuso,* 967 F.Supp. at 1443, reasoned that it could not "help but conclude that [plaintiff's expert] was not in fact an expert ... when he was hired by the plaintiffs, but that he subsequently attempted, with dubious success, to qualify himself as such be selective review of the relevant literature." This appears to be an apt description of what Mr. O'Donnell attempted to do in the present case.

The court stresses that it is no single factor which is dispositive of whether O'Donnell qualifies as an expert on the issue of general causation. Rather, it is the cumulative effect of the foregoing which convinces the court that O'Donnell lacks the lack of relevant "knowledge, skill, experience, training or education" to testify as an expert on the issue of general causation *vis-a-vis* the discontinuation of Paxil. As he admitted, O'Donnell is *not* a pharmacologist. Therefore, he cannot, as he does in his "expert report," opine to a "reasonable pharmacological certainty," that plaintiff is experiencing "withdrawal toxicity reactions from Paxil[.]" O'Donnell Rep. Clearly, allowing a pharmacist/nutritionist such as O'Donnell to testify in that way would run afoul of the rule that an expert must stay "within the reasonable confines of his subject area[.]" ' *Kass,* 2004 WL 2475606, at *2475606, at *4 (internal quotation marks and citations omitted). Simply put, the court agrees with the court's comment in *Newton* that "[p]laintiff's attempts to present O'Donnell as an expert pharmacologist [is] ... an extremely bold stretch." *Newton,* 243 F.Supp.2d at 279. [3]

ii. Reliability of Testimony?

**\*8** O'Donnell's lack of education, training and background as to Paxil becomes even more apparent when viewed in terms of the opinions which he has rendered in this case. That is so because a "court's evaluation of qualifications is not always entirely distinct from the court's evaluation of reliability." *Pearson v. Young,* No. CIV–99–1559–F, 2002 WL 32026157, at *3 (W.D.Okla. Jan. 17, 2002).

O'Donnell's opinion as to causation is that "DeVito is experiencing withdrawal toxicity reactions from Paxil, and indeed, each time he attempts to wean or lower the dosage, he again experiences such infinity [sic]." Glanville Aff., exh. E thereto. O'Donnell states that when plaintiff's dosage of Paxil is lowered, he suffers from the following "withdrawal signs and symptoms [:] anxiety, jitery [sic], agitation, nausea, drowsiness, generalized discomfort and vertigo[.]" O'Donnell Report 2. "For this opinion to be admissible, O'Donnell must have a *reliable scientific basis* to support not only (1) a casual relationship between" Paxil and the enumerated side-effects, "but also (2) his assertion that [Paxil] will produce these side-effects." *See Newton,* 243 F.Supp.2d at 679 (emphasis added). O'Donnell's report and deposition testimony are void of a scientific basis to support either of those assertions.

In terms of publications, O'Donnell testified that he was the editor of a non-peer reviewed book entitled "Drug Injury Liability, Analysis and Prevention." *Id.* at 98–99. That book contained a mere six sentences on SSRIs, including the two sentences on Paxil. *Id.* at 99. Given that minimal reference to SSRIs, it is not surprising that that book contains nothing about discontinuation symptoms. *See id.* It further appears that he has performed absolutely no research regarding Paxil, much less its discontinuation. *Id.* at 38–39. What is more, O'Donnell has done no scientific or clinical research of any kind for almost two decades. The last time he did any such research was in he "early '80s as part of a pharmacology lab sabbatical," where he was looking at vitamins and critical care drugs used in Intensive Care Units. *Id.* at 36.

In light of the foregoing, to allow plaintiff to rely upon Mr. O'Donnell's opinions as to general causation clearly would violate *Daubert'* s "requirement that the expert testify to scientific knowledge—conclusions support by good grounds for each step in the analysis[.]" ' *Amorgianos,* 303 F.3d at 267 (citations and quotation marks omitted).

b. Specific Causation

It stands to reason that if Mr. O'Donnell lacks (which he does) the qualifications to testify as to general causation, he lacks the qualifications to testify as to specific causation. His opinion as to specific causation suffers from the same infirmities, detailed above, as to general causation. Accordingly, the court finds that Mr. O'Donnell does not have the requisite qualifications to testify as to specific causation; and even if he did, his opinions in that regard are unreliable.

c. Warnings

**\*9** Glaxo contends that because O'Donnell "lacks any pertinent qualifications[,]" Def. Memo. at 14, he should not be allowed to testify that in his opinion the "lack of ... a precaution and warning about withdrawal risk and the need to taper [when discontinuing Paxil] renders the product defective due to an inadequate warning. *See* O'Donnell Report at 3. Plaintiff did not directly respond to this argument. Included in the list of highlighted credentials in plaintiff's memorandum of law is that Mr. O'Donnell "is currently involved in the teaching of New Drug Development and Regulations [.]" Pl. Opp'n Memo. at 2. However, plaintiff does not explain, or cite to any portion of O'Donnell's deposition explaining, how or why this position qualifies him to testify as an expert on warnings.

As with the other issues upon which plaintiff intends to offer O'Donnell's testimony, plaintiff baldly retorts that O'Donnell's "extensive experience qualifies as specialized knowledge gained through experience, training, or education[.]" Pl. Memo. at 4 (internal quotation marks and citations omitted). And, once again, he relies upon the argument that Glaxo's reasons to preclude O'Donnell's testimony regarding warnings should be saved for trial, *i.e.* they should be used to attack O'Donnell's credibility and the weight which the jury might give to his opinions regarding Paxil warnings.

i. Qualified?

O'Donnell "claim[s] to be an expert in drug labeling[.]" O'Donnell Dep'n at 90. Presumably he is including drug warnings within the province of this supposed expertise. In any event, to qualify as an expert it is not enough for a witness to simply declare that he is one. Federal Rule of Evidence 702 requires more. As plaintiff acknowledged, a witness must satisfy the court that he has a certain amount of "knowledge, skill, experience, training or education [ ]" in the relevant field before he can be deemed an expert. *See* Nora Beverages, 164 F.3d at 746 (internal quotation marks and citation omitted). Close examination of O'Donnell's deposition testimony reveals that he is lacking in each of those areas when it comes to the subject of the adequacy of prescription drug warnings.

O'Donnell's claimed expertise admittedly is "through experience," not through formal education. O'Donnell Deposition at 90–92. His experience consists primarily of

having attended continuing education ("CE") programs, where drug labeling was a topic. *Id.* Those CE programs were to satisfy his pharmaceutical and nutritionist CE requirements, however; and he was unable to elaborate on the substance of same. *See id.* Furthermore, O'Donnell has not consulted with any pharmaceutical company "concerning the labeling for any antidepressant[.]" *Id.* at 96. O'Donnell agrees "that the FDA [Food and Drug Administration] is the highest authority on how drugs are labeled in this country[,]" but he has also never consulted with them "concerning the labeling for any antidepressant. *Id.* For that matter, O'Donnell has not worked for or consulted with the FDA in any capacity. *See* Glanville Aff. at 9, ¶ 39. Thus, O'Donnell's experience in this area is extremely limited.

**\*10** Moreover, O'Donnell made two especially damaging concessions which seriously undermine the suggestion that he is an expert as to the adequacy of prescription drug warnings. O'Donnell readily agreed "that in assessing the adequacy of a label for a prescription drug, the expert rendering the opinion generally should be familiar with the clinical trials data on the drug as it relates to the side effect concerning which he is opining[.]" *Id.* at 192. Yet, O'Donnell frankly admitted that he had not reviewed any of the Paxil clinical trials data. *See id.* Similarly, O'Donnell conceded that "generally to reach a conclusion regarding the adequacy of a label for a prescription drug, the expert rendering the opinion should be familiar with at least a majority of the available medical literature on the drug as it relates to the side effect on which he is opining[.]" *Id.* at 193. Despite the foregoing, O'Donnell went on to testify that he has "not read the specific literature [ ]" relating to discontinuation symptoms of Paxil. *Id.* 193 and 45. In fact, he has only read "abstracts" of articles. *Id.* at 46–47. Finally, Mr. O'Donnell has not lectured on, or written anything (peer reviewed or not) about, "Paxil discontinuation symptoms apart from [his] export [sic] report in this case[.]" *Id.* at 45. As the foregoing clearly shows, Mr. O'Donnell does not "employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field[,]" which here is the adequacy of prescription drug warnings and Paxil in particular. *See* Kumho Tire, 526 U .S. at 152, 119 S.Ct. at 1176.

Mr. O'Donnell may qualify as an expert in the fields of pharmacy or nutrition, but that is not the purpose for which his testimony is being offered here. Instead, his testimony is being offered on the adequacy of Paxil warnings. O'Donnell has never been drafter or been asked to draft a warning for any antidepressant, let alone for Paxil. Likewise, he has not done

any research or written any publications on prescription drug warnings. Thus, whether judged in terms of his education or experience, does not rise to the level of "expertise ... that the jury would expect from a bona fide warnings expert." *See Robertson v. Norton,* 148 F.3d 905, 907 (8 th Cir.1998) (internal quotation marks omitted).

In sum, O'Donnell is being called upon to testify regarding the adequacy of the Paxil warning, an issue which clearly is outside the "reasonable confine [s] of his subject area[s,]" which are pharmacy and nutrition. *See Kass,* 2004 WL 2475606, at *4 (internal quotation marks and citations omitted). Therefore, because O'Donnell does *not* "possess the specialized knowledge required by Rule 702[,]" the court finds that he is not qualified as an expert on the issue of the adequacy of the Paxil warning. *See id.*

### ii. Reliability of Testimony?

 **\*11** Given the nature of the claims which plaintiff is alleging in this case, plainly there is a close relationship between excluding the causation opinion and excluding the warning opinions which are being offered by O'Donnell. *Miller v. Pfizer, Inc.,* 196 F.Supp.2d 1062 (D.Kan.2002), *aff'd on other grounds,* 356 F.3d 1326 (10 th Cir.2004), *cert. denied,* 125 S.Ct. 40 (Oct. 4, 2004), provides a good example of how a decision to preclude causation "expert" testimony impacts upon a decision to also preclude warning testimony. The plaintiff parents in *Miller* were suing the manufacturer of Zoloft, another SSRI, alleging that it caused their son to commit suicide. Similar to the present case, the plaintiffs in *Miller* asserted state law claims for strict liability for marketing defects and misrepresentations, and negligence for failure to test and warn. The court held that an "eminent" psychiatrist and neuropsychopharmacologist's proposed testimony regarding general causation, *i.e.* that Zoloft causes suicide, did not satisfy the *Daubert* criteria for admissibility because, in short, "he lack[ed] sufficient expertise on the issue of suicide." *Id.* at 1087 and 1088. The *Miller* court, as is this court, was then confronted with the issue of whether that same doctor could qualify as an expert who would opine "that Zoloft labels do not adequately warn against the danger of SSRI-induced suicide." *Id.* at 1088. After finding that the doctor was not an expert on that issue, the court soundly reasoned, "[i]f the jury will hear no evidence that [Paxil] causes [withdrawal symptoms/ addictive], it cannot possibly conclude that [Paxil] labels do not adequately warn against the danger that [Paxil]

causes [such condition.]" *Id.* at 1089. That reasoning applies with equal force here. Even if O'Donnell qualifies as a prescription drug warning expert, because neither O'Donnell nor Dr. George (plaintiff's only proof as to causation) qualify to testify about causation, the former's warning testimony "would essentially be irrelevant to any larger issues in the case." *See id.* Accordingly, there is no need to analyze whether O'Donnell's opinions as to warnings pass muster under *Daubert.*

In short, plaintiff DeVito has not sustained his burden of proving by a preponderance of the evidence that Mr. O'Donnell is qualified to render an opinion as to general causation, specific causation, or the adequacy of Paxil warnings. Even if O'Donnell could somehow be deemed to have the requisite "specialized knowledge" to testify as to any or all of those issues, "courts do not have to credit opinion evidence connected to data 'only by the *ipse dixit* of the expert." ' *Prohaska,* 138 F.Supp.2d at 438 (quoting *General Elec. Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. (1997)). That is all O'Donnell has to rely upon; simply because he offers an opinion which he claims to be valid, plaintiff assumes it is so. This court will not, however.

 **\*12** For the reasons set forth above, the court grants in its entirety Glaxo's motion to preclude the testimony of Mr. O'Donnell; Dr. George; and Ms. Sweeney.

### II. Summary Judgment Motion

The court assumes familiarity with the Supreme Court's trilogy of cases clarifying the governing legal standards on summary judgment motions, and sees no need to repeat those standards herein. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); and *Matsushita Elec. Industr. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986)

It is an understatement to say that the wholesale exclusion of the testimony of O'Donnell, George and Sweeney significantly impacts plaintiff DeVito's case. As discussed at the outset causation is a necessary element of each of the five causes of action which plaintiff is alleging herein. Because plaintiff's only causation evidence has been excluded, it necessarily follows that Glaxo is entitled to summary judgment in its favor. *See Kass,* 2004 WL 2475606 (after granting motion to exclude testimony of plaintiff's

claimed expert regarding the feasibility of alternative designs, court granted defense summary judgment motion because plaintiff could not satisfy the critical element of a design defect cause of action); and *Zwillinger,* 1998 WL 623589 (where plaintiff claimed that her exposure to defendants' carpeting causes her to develop immunotoxicity syndrome, court granted summary judgment in defendants' favor after excluding the doctor's testimony, which was plaintiff's only causation evidence).

To conclude, the court hereby GRANTS the motion by Smithkline Beecham Corporation d/b/a Glaxo Smithkline, to preclude the testimony of James O'Donnell; Dr. Kevin George; and Ms. Deborah Sweeney. The court further GRANTS the motion by Smithkline Beecham Corporation d/b/a Glaxo Smithkline for summary judgment pursuant to Fed.R.Civ.P. 56 dismissing all of plaintiff Michael DeVito's claims as against it.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 3691343

---

## Footnotes

1   The present action, which has been referred to as a "tag-along action," is one of a number throughout the country wherein plaintiffs are alleging that Glaxo knew of the hazardous side effects of Paxil and either concealed, misrepresented or failed to warn of them. *See In re Paxil Products Liability Litigation,* 296 F.Supp.2d 1374 (Judicial Panel on Multidistrict Litigation 2003). In mid-February 2004, this court was advised that the Judicial Panel on Multidistrict Litigation ("the Panel") had conditionally transferred this action to the United States District Court fo the Central District of California for coordinated or consolidated pretrial proceedings pursuant to ⚑ 28 U.S.C. § 1407." Glaxo moved to vacate that conditional transfer as it pertained to the present case. When plaintiff did not respond, on June 15, 2004, the Panel vacated that conditional transfer as it relates to Mr. DeVito.

2   During her deposition Ms. Sweeney unequivocally testified, "I'm not a physician. I'm not a nurse practitioner." Glanville Aff ., exh H thereto at 123. She holds an associates' degree in nursing, a bachelor of science degree in health and human services, and a nurse practitioner's degree." *Id.* at 12, 17, 35–36. Thus, to refer to Ms. Sweeney as "Doctor Sweeney, as plaintiff does throughout his expert disclosure, is not only a misstatement but directly contradicts Sweeney's own testimony. Plaintiff's tendency to exaggerate or overstate certain things, as will be seen, is not limited to the qualifications of his experts.

3   O'Donnell's insistence on holding himself out as a pharmacologist, *see* O'Donnell Dep'n at 54, ignores at least one fundamental distinction between pharmacology and pharmacy—a distinction which is critical here. "Pharmacology can be fairly described as the study of the effect of drugs on living organisms. Pharmacy, on the other hand, is the profession of preparing and dispensing drugs." ⚑ *Newton,* 243 F.Supp.2d at 677, n. 1. It is self-evident that there is a vast difference in the education, experience and skill necessary to obtain degrees in these two different fields.

   Apparently O'Donnell recognizes this distinction because in *Newton* he "admitted ... that from approximately 1982 to 1985, he intentionally and falsely advertised that he possessed a doctorate in pharmacology in an attempt to attract more interest from lawyers for his consulting expert business." *Id.* at 677, n .3 (citation omitted). He made that same admission in this deposition herein. O'Donnell Dep'n at 28–31. O'Donnell did change this advertisement because, in his words, it was "incorrect." *Id.* at 29. This court cannot overlook what at best appears to be a serious lapse in judgment, however.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.